**DEMUTH DEVELOPMENT
CORP., Plaintiff,**

v.

**MERCK & CO., INC., Defendant.**

**No. 75 C 941.**

United States District Court,
E. D. New York.

June 6, 1977.

John B. Amrod, Garden City, N. Y., for plaintiff.

Hughes Hubbard & Reed, New York City, for defendant by Robert J. Sisk, Pamela Chipega.

NEAHER, District Judge.

This action asserts the novel claim that the publisher of an encyclopedia of chemicals and drugs is liable in damages for allegedly misrepresenting the toxicity of a chemical utilized in plaintiff's product, thereby causing a loss of plaintiff's customers and business. On defendant's prior motion to dismiss the complaint, the court ruled that plaintiff had not stated a claim for relief on grounds of product defamation, since neither plaintiff nor its product had been mentioned in the alleged defamatory reference.[1] The court then declined to

dismiss plaintiff's two remaining claims grounded on negligence and willful misrepresentation in view of specific allegations of consequent injury. The case is again before the court on defendant's motion for summary judgment as to those claims based upon undisputed facts revealed in the parties' affidavits and documentation.

Plaintiff, a New York corporation, manufactures and sells an air sterilization appliance, the Demuth Glycol Vaporizer, which had been used in hospitals and by manufacturing firms requiring germ-free environments. Defendant ("Merck"), a New Jersey corporation, is a diversified chemical and pharmaceutical company. As a service to customers and others, it publishes and sells *The Merck Index* (hereinafter *"Index"*), advertising it as "an encyclopedia of chemicals and drugs [which] contains . . . information of value to chemists, biochemists, pharmacists, botanists, physicists, chemical engineers, and others interested in the life sciences." The *Index* offers information about some 10,000 chemicals, drugs and biologicals with respect to their "general, medical, or veterinary uses as well as toxicity."

The source of the parties' controversy is the *Index*'s treatment of triethylene glycol, a chemical indispensable to the operation of plaintiff's glycol vaporizer. It is triethylene glycol which, when vaporized in plaintiff's appliance, had been used as a germicidal agent to disinfect the air in hospitals, laboratories and other places where germ-free environments were required.

There is no question that, commencing with the publication of the Seventh Edition in 1960, some 276,500 copies of the *Index* had been circulated prior to August 1974, which linked the human toxicity of triethylene glycol with that of ethylene glycol. All of those copies and a fourth printing of the Eighth Edition in August 1974, which apparently precipitated this suit, contained the following references complained of by plaintiff:

---

1. See Memorandum and Order dated February 3, 1976.

"TRIETHYLENE GLYCOL . . .
*Human Toxicity*: See Ethylene Glycol.
[P. 1072.]

"ETHYLENE GLYCOL . . .
*Human Toxicity*. Constitutes a hazard when ingested; e. g., drinking of antifreeze fluid. Transient stimulation of CNS followed by depression; vomiting, drowsiness, coma, respiratory failure, convulsions, renal damage, which may proceed to anuria, uremia, death." [Pp. 434–35.]

Plaintiff alleges in substance that the quoted references misrepresented the toxicity of triethylene glycol, which plaintiff asserts to be completely non-toxic when inhaled as a vapor and significantly less toxic than ethylene glycol when ingested orally. According to the complaint, the *Index* was widely used by plaintiff's customers as a reliable authority on the toxic effect of chemicals and drugs. It is claimed that the alleged untrue publication caused those customers and potential customers of plaintiff to fear a toxic effect from triethylene glycol and to discontinue or refuse to purchase the glycol vaporizer as unfit and unsafe for air sterilization purposes. Alleging compensatory and punitive damages of $4,000,000, plaintiff seeks compensation for what it claims was either a negligent (second cause of action) or a willful (third cause of action) misrepresentation. Injunctive relief is also sought to restrain Merck from further publication of the complained of description of triethylene glycol.[2]

Although the issues are novel, Merck urges that they are ripe for summary adjudication. It contends there can be no material question of fact as to the toxicity of triethylene glycol when ingested in liquid form. Merck points to the affidavit admission of plaintiff's president that both ethylene glycol and triethylene glycol are harmful when ingested as liquids in sufficient amount. That concession, Merck argues, is fatal to plaintiff's claim that the *Index* cross-reference was untrue. This case, however, does not turn on whether a shot glass of ethylene glycol is more lethal than a coffee mug of triethylene glycol. The pivotal question, in light of the facts disclosed on the motion, is whether Merck owed any duty to plaintiff in respect of its publication of information about triethylene glycol. For the reasons which follow, that question must be answered in the negative.

■ Though the law of New York recognizes that "a negligent statement may be the basis of recovery of damage," the right of action is carefully defined. *Advance Music Corp. v. American Tobacco Co.*, 268 App. Div. 707, 53 N.Y.S.2d 337 (1st Dept. 1945), *rev'd on other grounds*, 296 N.Y. 79, 70 N.E.2d 401 (1946). The essential requirements of the cause of action are best stated in *International Products Co. v. Erie R. Co.*, 244 N.Y. 331, 337–38, 155 N.E. 662, 664 (1927), as follows:

"Not every casual response, not every idle word, however damaging the result, gives rise to a cause of action. . . . Liability in such cases arises only where there is a duty, if one speaks at all, to

2. Injunctive relief has become moot. The Ninth Edition of the *Index* published in 1976 contains a revised description of triethylene glycol which eliminates any explicit reference to human toxicity. Instead there appears the following statement:

"9345. TRIETHYLENE GLYCOL. *2,2′-[1,2-Ethanediylbis(oxy)]-bisethanol;* 2,2′-ethylenedioxybis (ethanol). C6H14O4; mol wt 150.17. C 47.99%, H 9.40%, O 42.62%. Prepd from ethylene oxide and ethylene glycol in the presence of sulfuric acid: Matignon *et al., Bull. Soc. Chim.* [5] 1, 1308 (1934). Manuf by forming ether-ester of HOCH2 COOH with glycol and then hydrogenating: Gresham, U.S. pat. 2,654,786 (1953 to du Pont).

CH2OCH2CH2OH
CH2OCH2CH2OH

"Colorless, hygroscopic, practically odorless liq; $d^{15}/_4$ 1.1274; bp 285°; bp14 165°; freezes at 7.2°; viscosity at 20° = 37.8 centipoises; $n^{15}/_D$ 1.4578. Miscible with water, alcohol, benzene, toluene; sparingly sol in ether; practically insol in petr ether. LD50 in mice, rats: 21, 15–22 g/kg orally; 7.3–9.5, 11.7 g/kg i.v.: Stenger *et al., Arzneimittel-Forsch.* 18, 1536 (1968).

"USE: In various plastics to increase pliability; in air disinfection."

"LD50" etc. above refers to a reported dose which was lethal to 50% of the animals tested when the chemical in liquid form was administered orally and intravenously to mice and rats.

give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care."

█ We can agree with plaintiff that Merck published the *Index* for a serious purpose and expected its readers to rely and act upon it as an authoritative source of accurate information concerning drugs and chemicals. But even if we assume that Merck was under a duty to its *readers* to provide such information with care, how does that help plaintiff? Plaintiff does not and could not claim it relied to its detriment on misinformation published by Merck. Nor does plaintiff point to any "relationship of the parties, arising out of contract or otherwise," which "in morals or good conscience" placed Merck under any duty towards plaintiff or its business. On the contrary, Merck's right to publish free of fear of liability is guaranteed by the First Amendment, see *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and the overriding societal interest in the untrammeled dissemination of knowledge. The right is circumscribed only by laws such as those respecting national secrets, copyright, obscenity, defamation and unfair competition. The court has already held that no claim for defamation is stated and plaintiff does not rely on any grounds other than negligence and willful misrepresentation.

█ Plaintiff's theory of negligence finds no support in the pertinent New York cases.[3] Assuming *arguendo* the *Index* reference to triethylene glycol was negligently erroneous[4] and led plaintiff's customers to cease using its glycol vaporizer, plaintiff would have no claim for damages against Merck. *Jaillet v. Cashman*, 235 N.Y. 511, 139 N.E. 714 (1923) (Dow, Jones & Company not liable in negligence for incorrect information sent out over its ticker where no contractual or fiduciary relationship with plaintiff); *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 174 N.E. 441 (1931) (accountants not liable to creditor of client for negligently prepared accounting statements); *Kings Creations Ltd. v. Conde Nast Publications Inc.*, 34 A.D.2d 935, 311 N.Y.S.2d 757 (1st Dept. 1970)(newspaper not liable in negligence for mistake in setting advertisement).

The rule stated in the foregoing authorities has not lost its vitality because of the expanded concept of "privity" evident in the more modern development of product liability law, as plaintiff contends. As one noted commentator points out, where misstatements are claimed to be the cause of loss, even a "reasonable anticipation that the statement will be communicated to others whose identity is unknown to the defendant, or even knowledge that the recipient intends to make some commercial use of it in dealing with unspecified third parties, is not sufficient to create a duty of care towards them." W. Prosser, Law of Torts, 708 (4th ed. 1971). The reason for such a rule is obvious. To quote Prosser again, it is required in order to avoid "[t]he spectre of unlimited liability, with claims devastating in number and amount crushing the

3. Although the *Index* is published in New Jersey, no authority has been found which indicates that New Jersey law would support plaintiff's claim on the facts pleaded.

4. A debatable assumption since triethylene glycol is derived from ethylene glycol and, as noted above, concededly can be toxic when ingested orally, although apparently not so when inhaled in vaporized form. See numer-

ous scientific articles attached to affidavits of Dr. Harold M. Peck, M.D., and Dr. Horace D. Brown, Ph.D., of Merck in support of motion for summary judgment. A leading manufacturer of triethylene glycol, Olin Corporation, labels its industrial shipping containers with a warning, "CAUTION! Do not take internally." Brown Aff., Exh. C.

defendant because of a momentary lapse from proper care . . . ." *Id.*

Here plaintiff claims $4,000,000 in compensatory and punitive damages because of an allegedly incorrect statement which had been published and republished for some 14 years before plaintiff decided to do anything about it. To hold there is liability in such a case would confer upon an "unforeseeable plaintiff"—to use Prosser's apt term—a right heretofore denied by the New York courts and not sanctioned by the Restatement of Torts. *Id.* at 255. Such a holding, moreover, would serve neither justice nor the public interest because of its manifestly chilling effect upon the right to disseminate knowledge.

Plaintiff's willful misrepresentation claim stands on no firmer footing. The claim is based on an exchange of letters between plaintiff's president and Merck. Although plaintiff's letter, which was dated April 16, 1974, is not part of the record, a copy of Merck's reply dated April 23, 1974, submitted by both parties, is sufficient for purposes of the present motion. The latter reveals that Merck informed plaintiff that the toxicity statement quoted in plaintiff's letter "is for ethylene glycol." Affidavit of Nina L. Demuth, Exh. B. Merck's letter also cited literature references showing lethal doses in mice for ethylene glycol, diethylene glycol and triethylene glycol. The letter concluded:

> "We are in the process of revising the toxicity statements for the 9th Edition of *The Merck Index* and shall correct the statement for triethylene glycol. I hope that this information answers your question."

Merck did in fact revise its statement about triethylene glycol in the Ninth Edition of the *Index*, n. 2 *supra*. It is plaintiff's complaint that before this was done Merck admittedly issued two additional printings of the unrevised Eighth Edition in or about August 1974, totaling 18,500 copies. Affidavit of Horace D. Brown, par. 4. That republication, according to plaintiff, constitutes the "willful disregard for plaintiff's rights" upon which the willful misrepresentation claim is bottomed.

Plaintiff wholly misconceives the nature of an action for willful misrepresentation. Basic to such a cause of action is a statement which induces a "plaintiff to act, or to refrain from acting, to his detriment." Prosser, *supra*, at 714. The statement must not only have been false but the plaintiff must have been unaware of its falsity and it "must have played a material and substantial part in leading the plaintiff to adopt his particular course . . . ." *Id.* None of these elements is present in the circumstances relied on by plaintiff. Merck's letter of April 23, 1974 clearly stated that the toxicity statement for triethylene glycol would be corrected in the Ninth Edition. Merck carried out that promise, n. 2, *supra*. It made no representation that interim printings of the Eighth Edition would not occur, nor was it under any duty to plaintiff to refrain from printing them. Plaintiff was not misled into acting or refraining to act by anything Merck said. Its sole claim is that its customers relied on the *Index* statement. Such a claim has been held insufficient as a matter of law. See *Advance Music Corp. v. American Tobacco Co.*, 268 App.Div. 707, 711, 53 N.Y.S.2d 337, 340–41 (1st Dept. 1945), *rev'd on other grounds*, 296 N.Y. 79, 70 N.E.2d 401 (1946).

The total absence of a claim for willful misrepresentation undoubtedly explains plaintiff's attempt to resort to an unpleaded "prima facie tort" theory of liability. That theory is of no assistance to plaintiff either. The undisputed facts disclosed in the parties' submissions lend absolutely no support to plaintiff's suggestion that Merck, in publishing the *Index*, engaged in a course of conduct for the sole purpose of wantonly inflicting harm upon the plaintiff. As previously noted, Merck had been publishing the complained of statement about triethylene glycol for some 14 years before plaintiff was heard from. Following plaintiff's letter, Merck corrected the statement in its new Ninth Edition. Thus it would be unreasonable to conclude that Merck's "acts were *solely* 'malicious', that is, that they were done 'without legal

or social justification' . . . " *Reinforce, Inc. v. Birney*, 308 N.Y. 164, 169, 124 N.E.2d 104, 106 (1954). *Reinforce* exemplifies the strict New York rule that to state a cause of action for prima facie tort a *sole* intent to injure must be demonstrated.[5] Plaintiff has made no such demonstration here.

In sum, plaintiff has failed to come forward with any specific facts showing that there is a genuine issue for trial. See *Dressler v. MV Sandpiper*, 331 F.2d 130 (2 Cir. 1964). Generalized claims of business loss caused by defendant's exercise of its right to publish cannot overcome the clear absence of liability as a matter of law. Defendant is therefore entitled to summary judgment dismissing the complaint.

SO ORDERED.

5. See Note, *The Prima Facie Tort Doctrine In New York—Another Writ?*, 42 St. John's L.Rev. 530, 534–35 (1968).