OPINION OF THE COURT
Herman Cahn, J.
Motion sequence numbers 002 and 003 are consolidated for disposition, and are disposed of in accordance with the following decision and order.
Defendants Buena Vista Publishing, Inc., doing business as Hyperion (Hyperion), and Seth Godin Productions, Inc. (SGP), move for an order, pursuant to CPLR 3211 (a) (1) and (7) and 3016 (b), dismissing the complaint, or, alternatively, for summary judgment, pursuant to CPLR 3211 (c).
This is a consumer class action brought on behalf of all persons who purchased a book entitled “The Beardstown Ladies’ Common-Sense Investment Guide” (the Book) prior to April 1998. The complaint alleges violations of General Business Law § 349 (deceptive practices) and § 350 (false advertising), common-law fraud and unjust enrichment. It arises over the claimed “23.4% annual return” of the Beards-town Business and Professional Women’s Investment Club (the Beardstown Ladies), which was reported on the cover and in the text of the Book.
*602 Defendant Hyperion published the Book. Defendant SGP, a book packager, arranged for the Book to be written in cooperation with the Beardstown Ladies. It negotiated, arranged and helped implement the deal between Central Pictures, Inc., the owner of the literary rights to books written by or on behalf of the Beardstown Ladies, and Hyperion.
FACTS
The Book is based upon the experiences of 16 women who formed an investment club in Beardstown, Illinois, in the early 1980’s. The Book is described on its cover, on the flyleaf and throughout the Book as an “investment guide” based on the extraordinarily successful “secret” investment strategy of the Beardstown Ladies. The complaint alleges that the Book was advertised, marketed and sold on the basis of the assertion that the Beardstown Ladies had achieved an annual rate of return of 23.4% over a 10-year period in their securities’ investments, using the methods described, therein. Such a note of return is far above the rate of return of the securities market as a whole, and far better than the rate of return achieved by many other sophisticated investors. Plaintiffs allege that they were induced to buy the Book on the basis of such claims, and on the suggestion that the Book would impart “secrets” known to the Beardstown Ladies which enabled them to achieve the claimed remarkable earnings. They assert, in fact, that the Book does not contain any secrets, and that the investment advice is general and unsophisticated and is readily available from other sources for free.
The complaint further alleges that in early 1998, after the claimed annual return of 23.4% was challenged, an audit of the Beardstown Ladies’ investment portfolio for the period from 1984 through 1993, by Price Waterhouse, revealed that the annual return for that period was actually 9.1%. During that same period, the Standard and Poor’s 500 average return was 14.9% and the average general stock fund return was 12.6%. On March 30, 1998, Betty Sinnock, the senior partner of the Beardstown Ladies, issued a statement in which she admitted that the claimed 23.4% annual return for 10 years was inaccurate, apologizing for the error and for the failure to check the figures for themselves. Shortly after the error was discovered, the Beardstown Ladies issued, and Hyperion shipped, a notice to booksellers for insertion in all copies of the Book, in which the Beardstown Ladies acknowledged, corrected and apologized for the error.
*603 Based on these allegations, plaintiffs seek here to impose liability, not on the Beardstown Ladies, but upon Hyperion and SGP, for the factual inaccuracy on the cover, the flyleaf and in the text of the Book.
The Complaint
The complaint contains four causes of action. The first cause of action is for deceptive trade practices under General Business Law § 349, based on defendants’ false claims, misrepresentations and omissions, allegedly made in order to market and sell copies of the Book. The second cause of action is for false advertising under General Business Law § 350. The third cause of action asserts fraud, based on plaintiffs’ purchase of the Book in reliance upon the various statements, claims, representations and omissions regarding the annual return and the secret investment strategy used by the Beardstown Ladies, which defendants allegedly knew were false and misleading, and upon which defendants intended plaintiffs and other purchasers of the Book to rely. The fourth cause of action asserts that defendants have been unjustly enriched from the sales of the Book based on the fraudulent claims, misrepresentations and omissions. Plaintiffs seek repayment of the purchase price, plus punitive damages, costs and attorneys’ fees.
The Parties’ Contentions
Defendants seek dismissal of the complaint on the ground that the contents of the Book, the cover and the flyleaf are all protected by the First Amendment. They maintain that, as publisher of the Book, they cannot be made the guarantor of the accuracy of the factual statements contained therein. They assert that plaintiffs’ allegations amount, at most, to a charge of negligence, and that courts have rejected the imposition of liability against publishers for negligence with respect to the accuracy of the contents of a publication. Defendants maintain that they had no duty to investigate or verify the factual statements made in the Book, and, thus, that their republication of the Beardstown Ladies’ error in calculating their rate of return cannot be actionable. They further argue that the constitutional protection for the Book’s contents cannot be evaded by characterizing the Book, or the material that appears on its cover or flyleaf, as commercial speech. They argue that because the purpose of the Book is not purely commercial, its contents cannot be subject to scrutiny under General Business Law §§ 349 and 350. Finally, they contend that the contents of the *604 Book do not lose their constitutional protection because portions are also used on the Book’s flyleaf and cover. They urge that the references to the erroneous rate of return on the cover and flyleaf come from the text itself, and are not transformed into unprotected commercial speech just because of their location on the outside of the Book.
In opposition to the motion, plaintiffs assert that their claims are based on the words used to advertise, market and sell the Book, what they refer to as the “advertising material,” and not the contents of the Book itself. They point to the pronouncement on the cover of the Book “23.4% annual return.” They further point to the following statements on the flyleaf and introduction: “With a portfolio worth more than $90,000 and an impressive average return of 23 percent, the Beardstown Ladies Investment Club has the secret recipe for investment success;” “The sixteen women have been outperforming mutual funds and professional money managers 3 to 1; now they reveal their secrets;” “Their hand-picked portfolio of fewer than 20 stocks has earned an average annual return of 23.4% — twice that of the Standard and Poor’s 500 and more than most professional money managers.” Plaintiffs contend that they need discovery to determine the role of defendants in the creation of the Book, and the creation of the false performance claims. They assert that discovery will demonstrate that the motivation for the contents of the “advertising material” was to maximize defendants’ profit, and, thus, that this “advertising material” constitutes commercial speech.
DISCUSSION
The motions to dismiss are granted, pursuant to CPLR 3211 (a) (1) and (7). The Book, its cover, the flyleaf and the introduction are all protected by the First Amendment; the statements on the cover, on the flyleaf and in the introduction are not purely commercial speech; and defendants do not have a duty to investigate the accuracy of the contents of the Book.
The First Amendment
To promote society’s overriding interest in the untrammeled dissemination of knowledge and free expression, the First Amendment strictly limits the imposition of liability on publishers for the contents of books. The right of free expression is circumscribed only by narrowly constructed and finely drawn restraints in areas such as copyright, defamation, unfair competition, incitement and obscenity. (Gooding v Wilson, 405 *605 US 518, 521-522 [1972]; Demuth Dev. Corp. v Merck & Co., 432 F Supp 990, 993 [ED NY 1977]; Daniel v Dow Jones & Co., 137 Misc 2d 94, 95 [Civ Ct, NY County 1987].) Free speech protections extend to works that provide entertainment and amusement, as well as those that provide instruction and advice, such as “how to” books. (See, Winter v Putnam’s Sons, 938 F2d 1033, 1036 [9th Cir 1991] [guide to collecting and cooking mushrooms]; Oxycal Labs. v Jeffers, 909 F Supp 719, 723-724 [SD Cal 1995] [book about preventing and curing cancer]; Ginsburg v Agora, Inc., 915 F Supp 733, 740 [D Md 1995] [investment newsletter]; Jones v Lippincott Co., 694 F Supp 1216, 1217-1218 [D Md 1988] [a nursing textbook]; Demuth Dev. Corp. v Merck & Co., supra [encyclopedia of chemicals and drugs].)
While an erroneous statement of fact is not worthy - of constitutional protection, it is inevitable in free debate. (Gertz v Robert Welch, Inc., 418 US 323, 340 [1974].) If such error is made actionable, there is the risk “of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.” (Supra, at 340.) “[A] rule of strict liability that compels a publisher * * * to guarantee the accuracy of [its] factual assertions may lead to intolerable self-censorship.” (Supra, at 340.) Thus, the First Amendment requires that even some falsehood be protected in order to protect speech that matters. (Supra, at 341.)
Applying these general principles, it is clear that the Book is protected under both the Federal and New York Constitutions, for its truthful, as well as erroneous, statements of fact. The Book is actually a “how to” book — specifically, it tells how to start an investment club. It describes the Beardstown Ladies’ investment history and strategy. It also has considerable entertainment value as it contains anecdotes and recipes.
In light of the clear constitutional protection afforded the Book, the Beardstown Ladies themselves have not been sued. Instead, plaintiffs sue the publisher and book arranger on the theory that false statements on the cover, flyleaf and in the introduction are purely commercial speech, subject to consumer fraud claims under General Business Law §§ 349 and 350. The heart of the statements which plaintiffs challenge as false, what they refer to as the “False Performance Claims,” is the Beardstown Ladies’ 10-year annual rate of return error, which appears in the text of the .Book, as well as on the cover, the flyleaf and in the introduction. This 23.4% annual return was touted as the Beardstown Ladies’ claim to fame since long *606 before the Book was written. As discussed below, the speech at issue is not purely commercial, and, thus, it is protected from false advertising and deceptive practices claims.
The Commercial Speech Doctrine
First Amendment safeguards are relaxed with respect to commercial speech, so that claims for false advertising or other commercial wrongs may be pursued. (City of Cincinnati v Discovery Network, 507 US 410, 431-432 [1993] [Blackmun, J., concurring].) Commercial speech may be regulated or proscribed based on its content. (See, Bolger v Youngs Drug Prods. Corp., 463 US 60, 65 [1983].) Thus, if commercial speech is found to be false or misleading, it is afforded no First Amendment protection at all. (City of Cincinnati v Discovery Network, supra, at 433-434.) The speech, however, must be purely commercial. (New York Pub. Interest Research Group v Insurance Information Inst., 161 AD2d 204, 205 [1st Dept 1990].) If it is found to be noncommercial speech, even falsehoods in the speech will be given full First Amendment protection. (City of Cincinnati v Discovery Network, supra.)
The Supreme Court has defined commercial speech as “speech which does ‘no more than propose a commercial transaction,’ ” and “is so removed from any ‘exposition of ideas.’” (Virginia State Bd. of Pharmacy v Virginia Citizens Consumer Council, 425 US 748, 762 [1976].) “[S]peech is not necessarily commercial simply because it is economically motivated or reflects the interest of a commercial enterprise or even if it is paid for by a profitmaking entity.” (New York Pub. Interest Research Group v Insurance Information Inst., supra, at 206.) As the Appellate Division has recognized, economic motivation alone is “insufficient to turn material into commercial speech * * * In fact, all publishers have an economic motivation to a greater or lesser extent.” (City of New York v American School Publs., 119 AD2d 13, 18 [1st Dept 1986], affd 69 NY2d 576 [1987].) To permit a publisher’s economic motivation to convert protected expression into commercial speech would turn every article published in the newspapers and periodicals into commercial speech, because they are sold for profit. (Supra.) This is not the law, particularly in New York, where the State Constitution provides “a broader scope of protection for speech.” (Daniel v Dow Jones & Co., 137 Misc 2d 94, 102 [Sup Ct, NY County 1987], supra [publisher not liable for false, misleading information in investment newsletter; subscription electronic news service held not commercial speech].)
*607 Paid advertisements can even be noncommercial speech, fully protected by the First Amendment. In New York Pub. Interest Research Group v Insurance Information Inst. (supra), the First Department refused to apply General Business Law §§ 349 and 350 to a series of advertisements because rather than propose a commercial transaction, they expressed the insurance industry’s social and political views. The Court found that the advertisements were not purely commercial speech, and the General Business Law could not constitutionally regulate their contents. The Appellate Division emphasized that only “purely commercial speech * * * can be subject to scrutiny under false advertising and deceptive practices statutes.” (Supra, at 205-206.)
In Gordon & Breach Science Publs. v American Inst. of Physics (859 F Supp 1521, 1523 [SD NY 1994]), the court, in applying the Federal Lanham Act and the comparable provisions under the New York General Business Law, dismissed claims challenging noncommercial publications. The court found that the article at issue, a review of scientific literature, was not commercial speech, even though it recommended some of the publisher’s periodicals as better than the plaintiffs periodicals. It reasoned that the publication, of the article had an educational purpose, and, thus, it was not encompassed within the commercial speech doctrine. (Supra, at 1533-1534.)
When a document contains both commercial and noncommercial messages, referred to as hybrid speech, there are several factors that can be evaluated to determine if the speech is commercial. (Bolger v Youngs Drug Prods. C orp., 463 US 60, 66-68, supra.) These factors include whether the material is conceded to be advertisement, whether it refers to a specific product, and whether the disseminator of the information had an economic motivation to disseminate it. In Bolger, the Court was evaluating pamphlets conceded to be advertisements for a specific product, condoms, which also contained discussions of public issues such as venereal disease and family planning. It held that the pamphlets were properly characterized as commercial speech. The Court, however, recognized that a different conclusion may be appropriate where the material advertises an activity itself protected by the First Amendment. (Bolger v Youngs Drug Prods. Corp., supra, 463 US, at 66-68, n 14, citing Murdock v Pennsylvania, 319 US 105 [1943] [advertisement for religious book cannot be regulated as commercial speech]; Jamison v Texas, 318 US 413 [1943].) Moreover, where the main purpose of the work is noncommercial, *608 and the commercial and noncommercial component parts of “a single speech are inextricably intertwined,” the Court cannot parcel out the speech “applying one test to one phrase and another test to another phrase * * * Therefore, [the Court must] apply our test for fully protected expression.” (Riley v National Fedn. of Blind, 487 US 781, 796 [1988]; see, Oxycal Labs. v Jeffers, 909 F Supp 719, 724-725, supra.)
The Book here is noncommercial speech — it was clearly not designed to sell another product. Neither the fact that it was sold for a profit, nor defendant publishers’ economic motivation, is sufficient to turn the Book into commercial speech. (See, City of New York v American School Publs., 119 AD2d 13, 17 [1st Dept 1986], affd 69 NY2d 576 [1987], supra.) The main purpose of the work is to tell the story of the Beardstown Ladies, to educate as to investment clubs and the Beardstown Ladies’ investment strategy, and to entertain.
Plaintiffs’ “False Performance Claims” center on the book cover, the flyleaf and the introduction. The words and phrases on the cover, the flyleaf and the introduction are not “core” commercial speech. At best, they could only be considered as hybrid commercial speech. While they have a commercial element — to entice readers to buy the Book, they also have artistic or content-related expression, which is entitled to full First Amendment protection. (See, Rogers v Grimaldi, 875 F2d 994 [2d Cir 1989] [movie title is of hybrid nature with artistic and commercial elements inextricably intertwined, and thus, is entitled to more First Amendment protection than the labeling of ordinary commercial products].) And, in contrast to the hybrid speech in Bolger v Youngs Drug Prods. Corp. (supra), this material is not conceded to be advertisements, and the specific product is not a condom, but a book, the contents of which are fully protected by the First Amendment. Moreover, the challenged statement which is the focus of plaintiffs’ claims, the 23.4% annual return, explicitly comes from within the contents of the Book. It cannot be transformed into purely commercial speech simply because of its change in location. As the Second Circuit has stated, “it is important to distinguish between advertising statements made to summarize an argument or opinion within a book and those made about a book as a product.” (Groden v Random House, 61 F3d 1045, 1052 [2d Cir 1995].) Here, the cover states a fact made by the authors in the text; it is not about the Book as a product.
Further, advertising that promotes noncommercial speech, such as a book, is accorded the same constitutional protection *609 as the speech it advertises. It is actionable only if it fails to accurately reflect the contents of the protected speech being promoted. (See, Guggenheimer v Ginzburg, 43 NY2d 268 [1977] [General Business Law §§ 349 and 350 claims permitted to proceed against dictionary ad claiming that it was the “authentic Webster’s” Dictionary, because ad did not accurately reflect the contents and source of the dictionary].) The “critical question is whether [this] promotional material relates to a speech product that is itself protected.” “[T]he challenged advertisement is not about laundry detergent; it cannot be divorced from the book * * * and the book is protected speech.” (Lane v Random House, 985 F Supp 141, 152 [D DC 1995].) Thus, the paid advertisements in New York Pub. Interest Research Group v Insurance Information Inst. (161 AD2d 204, supra) were held to be noncommercial speech, not subject to General Business Law §§ 349 and 350, because, rather than propose an economic transaction, they expressed an industry’s social and political views, clearly protected speech. (See also, Gordon & Breach Science Publs. v American Inst. of Physics, supra; compare, Marcus v Jewish Natl. Fund, 158 AD2d 101 [1st Dept 1990] [advertisements for charitable contributions solicited commercial transactions, and could be scrutinized under General Business Law §§ 349 and 350 as misleading].)
In Lane v Random House (supra), the plaintiff sued a book publisher over statements made in advertisements for a book evaluating conspiracy theories about President Kennedy’s assassination. The court held that the full First Amendment protection accorded to the contents of the book must apply equally to the advertisements promoting its sale. (Supra, at 152; see also, Groden v Random House, 1994 WL 455555, 1994 US Dist LEXIS 11794 [SD NY, Aug. 23, 1994, Martin, JJ, affd 61 F3d 1045 [2d Cir 1995], supra [same book and ad as in Lane, ad held privileged under “incidental use” exception, which the court reasoned is driven by First Amendment interest in protecting media’s ability to publicize its communications].)
Similarly, in National Life Ins. Co. v Phillips Publ. (793 F Supp 627 [D Md 1992]), the court held that advertisements, which accurately reprinted portions of a newsletter, including allegedly false statements, were entitled to the same First Amendment protection for factual error as the newsletter itself. The court reasoned: “If [protected material were] moved from a book or magazine interior, to the jacket cover, Plaintiff would have the speech’s protection reduced simply because of the change in ‘venue.’ Such a change of location should not alter *610 the law that governs the dispute.” (National Life Ins. Co. v Phillips Publ., supra, 793 F Supp, at 645, n 33.)
In the instant case, the statement at issue, the 23.4% annual return, not only relates to the protected contents of the Book, it comes directly from the text of the Book. Thus, it must be provided the same protection as the contents of the Book itself. The fact that a mistake in the text was repeated on the cover does not change the constitutional protection it is afforded. If, as plaintiffs seek in the instant case, excerpts of a book, published to inform the public of the nature and contents of the underlying speech, are deemed commercial speech subject to claims not available against the book itself, the contents of the underlying speech could be chilled.
The remaining language on the cover — “How We Beat the Stock Market — and How You Can Too” — and references to the Beardstown Ladies’ “secret recipe for investment success,” is not actionable, as it is simply puffery or opinion. (See, Bader v Siegel, 238 AD2d 272 [1st Dept 1997].)
This court is aware of the recent decision by the California Court of Appeal, the intermediate appeals court, in Keimer v Buena Vista Books (75 Cal App 4th 1220, 89 Cal Rptr 2d 781), holding that this challenged statement on the same book cover is purely commercial speech; however, it finds otherwise. The court determines that under the New York Constitution, and under the cases interpreting the Federal Constitution, particularly the Second Circuit cases (see, Groden v Random House, 61 F3d 1045, supra; Rogers v Grimaldi, 875 F2d 994, supra), the words challenged on the cover of the book, which are not conceded here to be advertisement, are not “core” commercial speech, and should be entitled to full First Amendment protection. This court differs with the Keimer court’s approach in that I recognize as paramount that the speech is not referring to a product such as condoms, as in Bolger (supra), the case heavily relied upon in Keimer, but rather it refers to a book, the contents of which are themselves protected by the First Amendment. (See, Bolger v Youngs Drug Prods. Corp., 463 US 60, 67, 68, n 14.)
Contrary to the cases relied upon by plaintiffs in their brief, the complaint here does not allege that plaintiffs were misled as to the contents of the product or service being offered. The “False Performance Claims” are not being challenged because they fail to accurately reflect the contents of the protected speech being promoted. (Cf., Guggenheimer v Ginzburg, supra; Marcus v Jewish Natl. Fund, supra [advertisement allegedly *611 misled consumers as to where the charitable contributions would be used]; Galaxy Export v Bedford Textile Prods., 84 AD2d 572 [2d Dept 1981] [package failed to describe contents accurately]; Rogers v Grimaldi, 875 F2d 994 [2d Cir 1989], supra [First Amendment protects title of movie as hybrid of expression and promotion, so long as title does not explicitly mislead as to authorship or content of work]; Simon & Schuster v Dove Audio, 970 F Supp 279 [SD NY 1997] [book title included plaintiffs trademarked title for another book, so would have misled as to origin of book].) Accordingly, the claims against defendants for false and deceptive advertising under General Business Law §§ 349 and 350 are dismissed.
With respect to the common-law causes of action, they are also dismissed. Plaintiffs’ allegations fail to state a claim, because defendants have no duty to investigate the accuracy of the contents of the book they published. (Winter v Putnam’s Sons, 938 F2d 1033, supra.) In Winter, the plaintiffs urged that the publisher had a duty to investigate the accuracy of the contents of The Encyclopedia of Mushrooms. After following this guide in picking and cooking wild mushrooms, plaintiffs became so ill that they required liver transplants. The court held that the publisher did not have such a duty, and that “[w]ere we tempted to create this duty, the gentle tug of the First Amendment and the value embodied therein would remind us of the social costs.” (Supra, at 1037; see also, First Equity Corp. v Standard & Poor’s Corp., 869 F2d 175, 179-180 [2d Cir 1989] [publisher of securities information publication has no duty to verify information]; Sinai v Mitchell Books, 996 F2d 1227 [9th Cir 1993] [publisher of auto repair books has no duty to investigate accuracy]; Demuth Dev. Corp. v Merck & Co., 432 F Supp 990, 993, supra; Daniel v Dow Jones & Co., 137 Misc 2d 94, 96, supra [publisher of investment news service has no liability for negligent misstatements]; Roman v City of New York, 110 Misc 2d 799, 802 [Sup Ct, Queens County 1981] [publisher of contraception booklet does not assume liability for all misstatements]; Birmingham v Fodor’s Travel Publs., 73 Haw 359, 833 P2d 70 [1992] [travel book publisher has no duty to warn of inaccuracy].) Moreover, with respect to the fraud cause of action, plaintiffs provide no factual basis whatsoever for their conclusory allegations that defendants knew and intended to mislead book buyers as to the Beards-town Ladies’ annual rate of return. The Beardstown Ladies publicized this precise rate of return before the Book was published, in their videotape, Cooking Up Profits on Wall Street, *612 and on news programs and in investment and retirement newsletters.
As discussed above, the First Amendment protects even erroneous statements in the contents of the Book, and on its cover, flyleaf and in the introduction, and to create a duty on defendants’ part to investigate or verify the factual statements made therein would run counter to that protection. Further, because defendants had no duty to investigate, their republication of the Beardstown Ladies’ error in calculating their rate of return is also not actionable.
Accordingly, it is ordered that the motions to dismiss the complaint are granted and the complaint is dismissed with costs and disbursements to defendants as taxed by the Clerk of the Court.