**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WAYNE CHARLES; FORT SELF
STORAGE, INC.,
   *Plaintiffs-Appellants,*

v.

CITY OF LOS ANGELES, a California
municipal corporation,
   *Defendant-Appellee.*

No. 10-57028

D.C. No.
2:10-cv-07260-
ABC-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
May 7, 2012—Pasadena, California

Filed October 15, 2012

Before: Kim McLane Wardlaw, Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Wardlaw

12341

## COUNSEL

Matthew C. Klase, Webb, Klase & Lemond, LLC, Atlanta, Georgia, for the plaintiffs-appellants.

Carmen A. Trutanich, City Attorney, Kenneth T. Fong, Deputy City Attorney, and Kim R. Westhoff, Deputy City Attorney, Los Angeles, California, for the defendant-appellee.

**OPINION**

WARDLAW, Circuit Judge:

We are called upon to write another chapter in "the story of billboards." *See World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 680 (9th Cir. 2010). After decades of litigation concerning the scope of permissible restrictions on billboards, "[t]he question of the day is no longer whether cities may regulate billboards at all, but is instead the extent to which they may do so consistent with the First Amendment guarantee of freedom of expression." *Id.* at 681. In the wake of *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) and *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009), it is clear that the City of Los Angeles ("City") may more strictly regulate offsite[1] commercial signs than noncommercial signs. And, indeed, the City's sign ordinance requires a building permit for all temporary signs other than those containing "a political, ideological or other noncommercial message." Los Angeles Municipal Code ("LAMC") § 14.4.16(A).

Wayne Charles and Fort Self Storage ("Appellants") sought to install a temporary offsite sign advertising the television program "E! News" without obtaining the required City permits. Deeming the sign "strictly commercial in nature," the City notified Appellants that installation of the proposed sign would violate several provisions of its sign ordinance. The district court agreed with the City and granted judgment in its

---

[1]LAMC § 14.4.2 defines an "Off-Site Sign" as "[a] sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located." We have held that "offsite advertising, or offsite signage, refers to a sign on private property advertising commercial services or wares purveyed elsewhere than on the premises where the sign is located." *Metro Lights*, 551 F.3d at 900 n.1.

favor. We must decide whether advertisements for expressive works constitute noncommercial speech within the meaning of the City's sign ordinance and are thus protected speech under the First Amendment to the U.S. Constitution.

## I.

In accord with decades of judicial guidance, the City's Sign Ordinance, Article 4.4 of Chapter 1 of the LAMC, regulates commercial speech far more extensively than it does noncommercial speech. *See Metro Lights*, 551 F.3d at 906 n.9 ("[W]e have held that the Los Angeles Sign Ordinance only prohibits commercial offsite signs."); *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 613 (9th Cir. 1993) ("Because our First Amendment jurisprudence recognizes a distinction between commercial and noncommercial speech, government officials have to place a particular message into one or the other category for purposes of regulation."); *see also* LAMC § 14.4.1(F) (explaining that the Sign Ordinance is written to "conform to judicial decisions, thereby limiting further costly litigation and facilitating enforcement of these regulations."). The City's Sign Ordinance requires "a building permit . . . for a temporary sign . . . other than one that contains a political, ideological or other noncommercial message." LAMC § 14.4.16(A).

Appellants agreed that Fort Self Storage would lease exterior wall space to Charles for the display of temporary signs bearing "content related to motion pictures, theatrical productions, television and radio programming, music, books, newspapers, paintings, and other works of art." Appellants assert that advertisements in this category are exempt from the Sign Ordinance's permitting requirement under the clause exempting signs "contain[ing] a . . . noncommercial message" from the permit requirement.

Appellants proposed to display as their first sign an image composed of the logo for the television show "E! News," and

photographs of the show's hosts, Ryan Seacrest and Giuliana Rancic.[2] In a wise exercise of caution before erecting the sign, Appellants informed the City's Building and Safety Department of their intent to install the sign, seeking confirmation that it was indeed exempt from the permitting requirements. The City responded in a letter dated September 10, 2010 that the sign "appear[ed] to be strictly commercial in nature" and was thus subject to the Sign Ordinance's permitting requirements. The City further notified Appellants that installation of the sign would violate several provisions of the Municipal Code and advised them to cease and desist. Because the City has taken action to enforce its sign ordinance many times in the past, Appellants believed that the City would enforce the Sign Ordinance against them if they installed the proposed sign.

On September 29, 2010, Appellants sued the City in federal district court. They seek a declaratory judgment that the proposed E! News sign and all other signs they intend to display with "content related to motion pictures, theatrical productions, television and radio programming, music, books, newspapers, paintings, and other works of art" are exempt from the City's permitting requirements for temporary commercial signs. Appellants claim that the City's decision to classify their proposed signs as commercial speech violates the First Amendment as applied to Appellants' speech, and that the City violated Appellants' equal protection rights "by prohibiting [them] from posting their proposed signs, but allowing other favored entities and organizations to post similar signs bearing similar content."

Appellants also sought a temporary restraining order barring the City from taking any actions against Appellants for posting the E! News sign or any other signs with content related to expressive works. The district court denied Appel-

---

[2]We have included an image of the proposed sign as Appendix A to this opinion.

lants' TRO application two days later. The district court also denied their subsequently filed motion for preliminary injunctive relief on November 12, 2010. The district court concluded that the City's "judgment that the E! News billboard was commercial was both legally correct and reasonable," and that Appellants had "failed to demonstrate any chance of success on the merits of their First Amendment challenge."

On November 5, 2010, the City moved to dismiss the complaint, arguing that Appellants lacked standing, that their claims were not ripe, and that their claims should be dismissed because the E! News sign constituted commercial speech and the City could regulate it accordingly. Ruling on this motion, the district court dismissed as unripe Appellants' claims concerning unspecified future signs bearing " 'content related to . . . works of art,' " and evaluated only those claims relating to the proposed E! News sign. The court found that Appellants had standing to challenge the City's classification of the E! News sign, but rejected Appellants' contention that the proposed billboard should be considered an adjunct of or incidental to the E! News television program, which enjoys the same First Amendment protection for noncommercial expression as the advertised news program itself.

Following the Supreme Court's guidance for determining when speech is deemed commercial, the district court found that the E! News billboard qualified as commercial speech and did not contain "even arguably noncommercial content." *Charles v. City of Los Angeles*, 757 F. Supp. 2d 989, 1003 (C.D. Cal. 2010). The district court also reasoned that the City was due a certain amount of deference in deciding how to categorize Appellants' message, explaining that Ninth Circuit precedent established that—at least when it comes to billboards— "the City must be given some space to apply the tests for commercial speech and to reach reasonable judgments as to what is and is not commercial, lest federal courts become the first-line arbiters of hundreds of thousands of billboards to be erected across the country." *Id.* at 1004. The dis-

trict court entered judgment in favor of the City on December 7, 2010.

We have jurisdiction under 28 U.S.C. § 1291 and review de novo an order granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Madison v. Graham*, 316 F.3d 867, 869 (9th Cir. 2002). We accept "all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009).

## II.

**[1]** Appellants do not challenge the constitutionality of the Sign Ordinance as generally applied to commercial speech, but contend that the district court erred in determining that the proposed E! News sign constitutes commercial speech. The question before us is whether truthful advertisements for expressive works protected by the First Amendment are inherently noncommercial in nature.

### A.

"Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (internal quotation marks and alterations omitted). While it is clear that the City may restrict the proliferation of offsite billboards bearing commercial messages, *see Metro Lights*, 551 F.3d at 911, in many areas "the boundary between commercial and noncommercial speech has yet to be clearly delineated." *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001).

**[2]** To determine whether the E! News sign constitutes commercial speech, we follow the Supreme Court's guidance

in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983). "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66-67). "[T]he 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.' " *Hoffman*, 255 F.3d at 1184 (quoting *Bolger*, 463 U.S. at 66).

**[3]** Appellants concede that the proposed E! News sign is an advertisement, and it is undisputed that the sign refers to a particular cultural product and that Appellants have an economic motivation in encouraging the public to view the program. Appellants further concede that "advertisements for noncommercial expressive works . . . technically propose a commercial transaction," but suggest that such advertisements *always* go beyond a bare proposal for a commercial transaction because they also "promote the ideas, expression, and content contained in the works and thus they are too entitled to full First Amendment protection." The test for commercial speech is not so lacking in nuance.

Certain advertisements for noncommercial works might include both an invitation to participate in a commercial transaction as well as some amount of noncommercial expression entitled to heightened First Amendment protection. If "nothing 'prevents the speaker from conveying, or the audience from hearing, . . . noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages,' " then the government may permissibly restrict the commercial message regardless of its proximity to noncommercial speech. *Hunt*, 638 F.3d at 715-16 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989)). If, however, speech includes both noncommercial and commercial elements that "are inextricably intertwined, . . . we apply our test for fully protected expression."

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

The E! News billboard does not present intertwined speech. The sign consists only of photographs of the program's hosts and the name of the program; no other message is conveyed. That the underlying E! News program is itself entitled to full First Amendment protection does not cloak all advertisements for the program with noncommercial status; speech inviting the public to watch E! News is not inherently identical to the speech that constitutes the program itself.

**[4]** In light of Appellants' concessions that the E! News sign is an advertisement for a particular product and that it proposes a commercial transaction, the district court properly determined that the E! News sign was commercial speech and correctly dismissed Appellants' claims.

Appellants maintain, however, that the test for commercial speech set forth in *Bolger* is inapplicable because the *Bolger* Court suggested in a passing footnote that "a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment." *Bolger*, 463 U.S. at 67 n.14. Appellants misread the Court's dictum in *Bolger*, which rested on two cases concerning religious speech, *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), and *Jamison v. Texas*, 318 U.S. 413 (1943). The citations to *Murdock* and *Jamison* indicate that the concern animating the Court's footnote in *Bolger* was the possibility that under certain circumstances, a mechanical application of the test for commercial speech might permit state action that impermissibly restricted political, religious or other protected noncommercial speech.

In both *Murdock* and *Jamison*, the Court overturned the convictions of Jehovah's Witnesses who had been prosecuted for religious speech that solicited donations, sometimes in exchange for religious texts. While the religious speech at

issue in both cases bore some of the hallmarks of commercial speech, it was unquestionably part of a protected religious activity. In *Murdock*, the Court stressed that the Witnesses' religious practice of door-to-door solicitation and distribution of literature about their religious beliefs was distinct from the actions of ordinary commercial booksellers:

> The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. . . . [A]n itinerant evangelist however misguided or intolerant he may be, does not become a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him. . . . On this record it plainly cannot be said that petitioners were engaged in a commercial rather than a religious venture. It is a distortion of the facts of record to describe their activities as the occupation of selling books and pamphlets.

*Murdock*, 319 U.S. at 111. In *Jamison*, the Court drew a similar distinction between purely commercial handbills and handbills that were distributed as part of one's religious pursuits:

> The state can prohibit the use of the street for the distribution of purely commercial leaflets, even though such leaflets may have 'a civic appeal, or a moral platitude' appended. They may not prohibit the distribution of handbills in the pursuit of a clearly religious activity merely because the handbills invite the purchase of books for the improved understanding of the religion or because the handbills seek in a lawful fashion to promote the raising of funds for religious purposes.

*Jamison*, 318 U.S. at 417 (citation omitted). In both decisions, the Court drew a sharp contrast between the actions of ordinary, commercial booksellers and the activities of Jehovah's Witnesses, who distribute literature as part of a religious mandate of evangelism. In neither case did the Court imply that ordinary advertisements for books were themselves noncommercial; indeed, the cases suggest the opposite conclusion. Fairly read in combination with the decisions it cites, footnote 14 in *Bolger* provides no support for Appellants' position.

## B.

Seeking an alternative avenue to sidestep the *Bolger* inquiry, Appellants cite a series of California state cases to support a novel argument: truthful advertisements for expressive works are inherently noncommercial speech, because they are accorded the same First Amendment status as the underlying advertised work. But the cases Appellants rely on concern only liability for particular state law torts, not regulations of general application, such as the Sign Ordinance here. We agree that in the circumscribed context of specific tort actions, such a rule may apply. We decline, however, to extend this limited exception.

**[5]** Faced with the need to ensure that First Amendment-protected expression is not unduly chilled by the threat of tort actions that would otherwise prevent the truthful promotion of protected expressive works, under certain circumstances we extend an advertised work's First Amendment protection to advertisements for the work. For example, constitutional protection from tort liability extends to truthful advertisements for news publications that are "merely an adjunct of the protected publication and promote[ ] only the protected publication," and make no other false claims. *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 639 (9th Cir. 1982) (citing *Guglielmi v. Spelling-Goldberg Productions*, 603 P.2d 454, 462 (Cal. 1979) (Bird, C.J. concurring)).

The First Amendment extends to the sale of truthful information about a public figure, and thus renders such conduct non-actionable under a right to publicity theory. The value of free expression outweighs the right of publicity in these circumstances. "Any other conclusion would allow reports and commentaries on the thoughts and conduct of public and prominent persons to be subject to censorship under the guise of preventing the dissipation of the publicity value of a person's identity." *Id.* at 638 (quoting *Guglielmi*, 603 P.2d at 461-62 (Bird, C. J. concurring)). We extend this protection from tort liability, which is ordinarily limited to noncommercial speech, to advertisements for expressive works so as to prevent tort actions from choking the truthful promotion of protected speech. *See Guglielmi*, 603 P.2d at 462 (Bird, C. J. concurring) ("It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise."). Applying this principle in an action brought by "[a] well-known entertainer who performs under the name 'Cher' " against a magazine that used an image of her as part of a campaign promoting subscriptions, we held that the magazine "would have been entitled to use Cher's picture and to refer to her truthfully in subscription advertising for the purpose of indicating the content of the publication, because such usage is protected by the First Amendment." *Cher*, 692 F.2d at 636, 639 (citation omitted). We explained that "[a]dvertising to promote a news medium . . . is not actionable under an appropriation of publicity theory so long as the advertising does not falsely claim that the public figure endorses that news medium." *Id.* at 639. Serious First Amendment concerns would otherwise be raised, as news publications would be blocked from advertising their contents for fear of tort liability.

New York courts similarly treat advertisements for protected works as "incidental" to the protected work and thus entitled to the same First Amendment status as the advertised work in cases involving similar tort actions. *See, e.g.*, *Groden v. Random House, Inc.*, 61 F.3d 1045, 1049 (2d Cir. 1995)

(collecting cases). For example, in a tort action brought under New York's right of privacy, Joe Namath sued Sports Illustrated magazine over its use of a photograph, "which was originally used by defendants, without objection from plaintiff, in conjunction with a news article published by them on the 1969 Super Bowl Game," when the magazine reused the photograph to advertise subscriptions to the magazine. *Namath v. Sports Illustrated*, 371 N.Y.S.2d 10, 11 (N.Y. App. Div. 1975), *aff'd*, 352 N.E.2d 584 (N.Y. 1976). Because the advertisement merely called attention to "the general nature of the contents of what is likely to be included in future issues of the magazine," the state court held that "[t]he use of plaintiff's photograph was merely incidental advertising of defendants' magazine in which plaintiff had earlier been properly and fairly depicted and, hence, it was not violative of the Civil Rights Law." *Id.* at 12, 11.

To protect the ability of speakers to promote their work, the "incidental use" exception to general commercial speech principles has also been extended to actions for false advertising, where advertisements that accurately reprinted false claims contained in the advertised works were protected from tort liability to the same degree as the underlying works. For example in *Lacoff v. Buena Vista Publ'g, Inc.*, 705 N.Y.S.2d 183, 186-187 (N.Y. Sup. Ct. 2000), purchasers of an investment book alleged that the book falsely claimed that a group called "the Beardstown Ladies" employed a "secret" investment strategy that had earned them annual returns of 23.4%. Holding that advertisements that accurately reflected the contents of the book were protected from tort liability to the same extent as the book itself, the trial court explained that

> If, as plaintiffs seek in the instant case, excerpts of a book, published to inform the public of the nature and contents of the underlying speech, are deemed commercial speech subject to claims not available against the book itself, the contents of the underlying speech could be chilled.

*Id.* at 191. *See also Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 644-45 (D. Md. 1992) (observing that if advertisements that merely reprinted text from protected newsletter could support an action for defamation, the result would be "that commentators on national issues could enjoy . . . uninhibited, robust debate . . . only so long as their statements did not happen to be reprinted in advertisements for their books, articles and television programs"). *But see Keimer v. Buena Vista Books, Inc.*, 89 Cal. Rptr. 2d 781, 788 (Cal. Ct. App. 1999) (holding that the identical advertisements as those in *Lacoff* constituted commercial speech).

New York's "incidental use" exception thus serves the same function as our exception for advertisements that are "adjunct" to a protected work: if advertisements for expressive works were not entitled to the same immunity from tort as the underlying work, publishers would be unable to truthfully advertise certain protected works. *See Groden*, 61 F.3d at 1050-51 ("It is clear that what drives the 'incidental use' exception [to New York's state law privacy tort] is the First Amendment interest in protecting the ability of news disseminators to publicize, to make public, their own communications.") (quoting *Stern v. Delphi Internet Servs. Corp.*, 626 N.Y.S.2d 694, 700 (N.Y. Sup. Ct. 1995)) (internal quotation marks omitted); *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 350 (S.D.N.Y. 2002) ("The ancillary use exception gives news agencies, magazine publishers, etc. the ability to publicize their newsworthy articles without violating the right of privacy statutes.").

The principle unifying the exceptions to the commercial speech doctrine for advertisements for protected works is the need to protect advertisers from tort actions that would otherwise threaten the ability of publishers to truthfully promote particular works. While lower courts have occasionally used imprecise, overbroad language in describing these exceptions,[3]

---

[3]*See, e.g.*, *Rezec v. Sony Pictures Entm't, Inc.*, 10 Cal. Rptr. 3d 333, 339 (Cal. Ct. App. 2004) ("[J]ust as the films are noncommercial speech, so

it is only in the narrow context of this principle that we have recognized that the noncommercial First Amendment status of an underlying expressive work extends to advertisements for that work. Appellants now seek to extrapolate from these limited exceptions a categorical rule: truthful advertisements for noncommercial speech always share the identical level of First Amendment protection as the underlying speech. That the law extends special protection to advertisements for First Amendment-protected works in the context of certain tort actions, however, does not support a sweeping rule that advertisements for protected speech are "noncommercial" in all contexts.

[6] Doctrines extending noncommercial status from a protected work to advertising for that work are justified only to the extent necessary to safeguard the ability to truthfully promote protected speech. As Appellants have not shown that applying the Sign Ordinance to advertisements for expressive works threatens the ability of speakers to publicize protected speech, we find no reason to extend the adjunct use exception to the context of billboard regulation. Significantly, the City does not seek to regulate the content of the underlying E! News program or to single out E! News advertisements in particular, but only to enforce broadly applicable guidelines that govern the placement of all commercial advertising. *Cf. Nat'l Life Ins. Co.*, 793 F. Supp. at 644 ("Plaintiff's complaint is over the fact that the statements were made, not over where they happen to appear. . . . [I]t is only their chance appearance in the promotional materials that brings any color at all to 'the cheeks' of Plaintiff's argument."). Moreover Appellants' proposed categorical rule would radically enlarge the recognized

is an advertisement reflecting their content."); *Lacoff*, 705 N.Y.S.2d at 190 (N.Y. Sup. Ct. 2000) ("[A]dvertising that promotes noncommercial speech, such as a book, is accorded the same constitutional protection as the speech it advertises. It is actionable only if it fails to accurately reflect the contents of the protected speech being promoted.").

exceptions to the First Amendment's limited protection for advertising. Such a rule would place truthful advertisements for books, films, video games, *see Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011), topless dancing, *see Chase v. Davelaar*, 645 F.2d 735, 738 (9th Cir. 1981), and all other forms of noncommercial expression beyond the reach of commercial speech regulations. No court has ever suggested that such a broad exception to the commercial speech doctrine is required,[4] and Appellants have presented no cause for us to so hold.

## III.

The district court did not entirely rest its determination that the E! News billboard was commercial speech on deference to the City's decision. It nonetheless concluded that deference to the City's evaluation of the sign's First Amendment status was appropriate, reasoning that "the City must be given some space to apply the tests for commercial speech and to reach reasonable judgments as to what is and is not commercial, lest federal courts become the first-line arbiters of hundreds of thousands of billboards to be erected across the country." *Charles*, 757 F. Supp. 2d at 1004. Because the judiciary has an essential role in safeguarding the First Amendment's guarantees, we must note our disagreement with the district court's view of the extent of deference owed City officials.

---

[4] Indeed, several of the cases cited by Appellants reject the precise rule Appellants suggest. *See, e.g.*, *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1541 n.8 (S.D.N.Y. 1994) ("Of course, the fact that an advertisement promotes a good or service protected by the First Amendment does not serve by itself to remove the ad from the realm of commercial speech . . . ."), *holding modified on other grounds by Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002); *William O'Neil & Co., Inc. v. Validea.com Inc.*, 202 F. Supp. 2d 1113, 1121-22 (C.D. Cal. 2002) (holding that an advertisement for a book was immune from particular tort liability as an adjunct to a protected work, but expressly declining to determine whether the advertisement was categorically noncommercial speech).

**[7]** We have explained that deference is due to a city's *legislative* decisions addressing the spread of billboard advertising, as these decisions require the balancing of interests such as traffic safety, revenue, and aesthetics. *See Metro Lights*, 551 F.3d at 910-11. We therefore defer to the City's choices in creating broad legislative schemes addressing regulation of commercial speech; we have never urged similar deference to City officials' evaluations as to the constitutional status of particular speech. While municipal officials are authorized to make determinations—guided by judicial precedent—as to whether particular speech is commercial, a district court reviewing such a determination may not defer to the City on a question of constitutional law.

**[8]** The specter the district court raised of the "federal courts becom[ing] the first-line arbiters of hundreds of thousands of billboards to be erected across the country," *Charles*, 757 F. Supp. 2d at 1004, is insufficient to counsel against de novo review of a municipality's determination that certain speech is not entitled to full First Amendment protection. In cases involving "the line between speech unconditionally guaranteed and speech which may legitimately be regulated," *Speiser v. Randall*, 357 U.S. 513, 525 (1958), the Supreme Court has instructed that "judges . . . must exercise [independent] review in order to preserve the precious liberties established and ordained by the Constitution." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510-11 (1984). We therefore extend "a special solicitude for claims that the protections afforded by the First Amendment have been unduly abridged." *Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988) (quoting *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225, 1229 (7th Cir. 1985)) (internal quotation marks omitted). This "special solicitude" leads us to subject even a district court's factual determinations upholding restrictions on speech to particular scrutiny: "When a district court holds a restriction on speech constitutional, we conduct an independent, de novo examination of the facts." *Id.* Deference to the "reasonable"

legal judgment of municipal officials is thus particularly inappropriate in the First Amendment context. Any increased burden on the courts occasioned by de novo review is outweighed by our constitutional responsibility; we may not abdicate our obligations in the name of efficiency. The district court's contrary conclusion was a misreading of our precedent.

## IV.

**[9]** While certain limited exceptions to the commercial speech doctrine are required in order to safeguard First Amendment values, we reject the need for a categorical rule according noncommercial status to all truthful advertisements for expressive works. The district court's judgment that the E! News sign constitutes commercial speech is **AFFIRMED.**

# APPENDIX A

