# IN THE SUPREME COURT OF CALIFORNIA

VERA SEROVA,

Plaintiff and Respondent,

v.

SONY MUSIC ENTERTAINMENT et al.,

Defendants and Appellants.

S260736

Second Appellate District, Division Two
B280526

Los Angeles County Superior Court
BC548468

August 18, 2022

Justice Jenkins authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Corrigan, Liu,
Kruger, Groban, and Guerrero concurred.

SEROVA v. SONY MUSIC ENTERTAINMENT

S260736


Opinion of the Court by Jenkins, J.


Plaintiff Vera Serova purchased *Michael*, an album of music billed as Michael Jackson's first posthumous release. The album's back promised "9 previously unreleased vocal tracks performed by" the pop superstar, but Serova now thinks some of these tracks, the so-called Cascio tracks, feature a Jackson imitator. She asserts *Michael*'s marketers misled her and violated two California consumer protection laws, the unfair competition law and the Consumers Legal Remedies Act, by misrepresenting the vocalist on the Cascio tracks through the album's packaging and in a promotional video.

The question before us is whether Serova's claims, premised on *Michael*'s packaging and video, are subject to the album marketers' motion to strike under California's anti-SLAPP statute, which calls for early dismissal of meritless lawsuits if they arise from a defendant's acts in furtherance of free speech rights in connection with a public issue. (Code. Civ. Proc., § 425.16, subd. (b)(1).)[1] The Court of Appeal concluded the motion to strike should be granted, reasoning the First Amendment shields the album marketers from liability. Even if the statements about Jackson's contributions were false, said the court, the First Amendment requires classifying them as noncommercial speech, a classification that would offer the

---

[1] Further statutory references are to the Code of Civil Procedure unless noted.

statements greater protection from government regulation and, per the parties' agreement, put them beyond the reach of the consumer protection laws Serova invokes. (*Serova v. Sony Music Entertainment* (2020) 44 Cal.App.5th 103, 124 (*Serova*).) The album marketers' statements were, in the court's view, noncommercial, because they "were directly connected to music that itself enjoyed full protection under the First Amendment" and "concerned a publicly disputed issue about which [the speaker] had no personal knowledge." (*Id.* at p. 126.) We disagree and reverse.

The album-back statement and video were commercial advertising meant to sell a product, and generally there "can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public." (*Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 563 (*Central Hudson*).) We recognize artistic works such as albums, in some instances, enjoy robust First Amendment protections, but that does not turn all marketing of such works into noncommercial speech, and it does not do so in this case. Additionally, a seller's purported lack of knowledge of falsity does not tell us whether that seller's speech is commercial or noncommercial, and commercial speech does not shed its commercial nature simply because a seller makes a statement without knowledge or that is hard to verify. The First Amendment has long coexisted with no-fault false advertising laws.

Lastly, we reject the album marketers' tardily raised argument that federal copyright law preempts Serova's consumer deception claims and deprives California courts of subject matter jurisdiction.

## I.     FACTS

### A.     *Michael*'s Release

Michael Jackson died in 2009.  A posthumous, 2010 album titled *Michael* stirred controversy even before its release.

According to Serova, people familiar with Jackson's voice disputed the authenticity of three of the album's tracks: "Breaking News," "Monster," and "Keep Your Head Up."  These tracks apparently emerged from a basement recording studio in the New Jersey home of Edward Cascio, whose family had befriended Jackson.  Doubters allegedly included Jackson's mother, three of his brothers (of The Jackson 5 fame), two of his children, three of his nephews, and two former music producers.

A month before *Michael*'s debut, the album's publisher, Sony Music Entertainment, spoke to the tracks originating from Cascio's basement.  It allegedly offered the public "complete confidence in the results of our extensive research as well as the accounts of those who were in the studio with Michael that the vocals on the new album are his own."

A week later, a lawyer for Jackson's estate issued an open letter to fans.  The estate named people who believed Jackson was indeed the lead vocalist on the Cascio tracks.  These included six of Jackson's former producers or engineers, who reviewed raw vocals at a listening session; one of Jackson's previous musical directors; one of Jackson's vocal directors; two hired forensic musicologists; and two other industry professionals with connections to Jackson.  The estate, furthermore, had obtained assurances a Jackson imitator rumored to be involved was not.  Though asserting "overwhelming objective evidence" of authenticity, the estate

pledged to follow up and noted, "[U]ltimately, Michael's fans will be the judges of these songs."

As *Michael*'s release approached, Sony Music Entertainment, the Jackson estate, and possibly MJJ Productions, Inc., the copyright holder for *Michael*, produced a video commercial juxtaposing images of Jackson with a voiceover announcing, "*Michael*, the brand new album from the greatest artist of all time." Cascio, meanwhile, appeared on *The Oprah Winfrey Show* and, in an episode featuring the album, asserted Jackson had sung the lead vocals on the disputed tracks.

When Sony Music Entertainment and the Jackson estate released *Michael*, the album's front cover contained images of the pop legend. The album's back, after listing the included songs, stated, "This album contains 9 previously unreleased vocal tracks performed by Michael Jackson."

## B.    Serova Purchases *Michael*

Serova purchased a CD of *Michael*, relying, she claims, on representations that Jackson had sung the lead vocals on the Cascio tracks. Specifically, she claims to have relied upon the album's packaging, the video commercial, Cascio's statements on *The Oprah Winfrey Show*, and the Jackson estate's letter.

As more information about the Cascio tracks emerged, Serova began to doubt Jackson was the lead vocalist, going so far, it appears, as commissioning an audio expert to evaluate the tracks. That expert allegedly found it "very likely" Jackson was not the singer, and an independent reviewer allegedly found the expert's methods and conclusions reasonable.

Serova also came to suspect that Cascio and his associates had "exclusive knowledge" Jackson was not the lead vocalist and

had "actively concealed" this from Sony Music Entertainment and the Jackson estate in dealings over the tracks. Serova asserts Sony Music Entertainment and the Jackson estate chose to include "Breaking News," "Monster," and "Keep Your Head Up" in part because Cascio offered assurances of their authenticity.

## C. Serova's Class Action Lawsuit and Sony's Special Motion To Strike

Serova filed suit seeking to represent a class of all California purchasers of the Cascio tracks. She alleges Sony Music Entertainment, Jackson's estate, and MJJ Productions, Inc., (collectively Sony) violated the Consumers Legal Remedies Act (CLRA) and the unfair competition law (UCL) in marketing the disputed songs through the album packaging, video commercial, and estate letter. She alleges Cascio and his associates not only violated those same consumer protection laws, but also intentionally defrauded her and her fellow purchasers with misstatements on *The Oprah Winfrey Show* and, indirectly, by deceiving Sony. Serova sought to enjoin marketing the Cascio tracks as Jackson performances and to obtain restitution, disgorgement of profits, damages, punitive damages, costs of suit, and attorney fees.

Sony filed a special motion to strike Serova's CLRA and UCL causes of action, invoking Code of Civil Procedure section 425.16. This statute — the anti-SLAPP statute — calls for early dismissal of claims if they arise from a defendant's acts in furtherance of free speech rights in connection with a public issue and if a plaintiff cannot demonstrate a probability of prevailing. (§ 425.16, subd. (b)(1).) Sony's memorandum of points and authorities supporting its motion argued the album-back statement, video commercial (which it assumed, for

the motion, similarly conveyed that Jackson had sung all of *Michael*'s lead vocals), and estate letter were protected by the anti-SLAPP statute and were not actionable.

To facilitate having its motion to strike heard without discovery (see § 425.16, subd. (g) [allowing discovery into challenged claims for good cause]), Sony stipulated it would, for the time being, only argue Serova's consumer deception claims lacked merit for two reasons: (1) its speech was noncommercial, conferring it heightened First Amendment protection and putting it beyond the reach of consumer protection laws; and (2) its speech was "not sufficiently false or misleading," even "assuming solely for purposes of this determination . . . Michael Jackson did not sing the lead vocals on" the Cascio tracks. Because Sony did not otherwise contest the merits of Serova's claims, Serova had no reason to otherwise support them.[2]

The superior court partially granted Sony's motion. It ruled Serova's challenges to the album packaging, video

---

[2] The parties' stipulation produced an anti-SLAPP motion with almost no evidentiary submissions. There was no declaration from Serova explaining what she knew and why she purchased *Michael*, nor do we have any of the experts' conclusions regarding *Michael*. And Serova has not had to square her alleged harm with her prepurchase knowledge of the Cascio track controversy. (See, e.g., *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 326–327 [UCL plaintiff must show economic loss and causation to have standing to sue].) Initially, the superior court refused the parties' issue-limiting stipulation and declined ruling on Sony's anti-SLAPP motion. But Sony sought a writ petition and, after the Court of Appeal issued a *Palma* notice suggesting it would grant the petition (see *Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233 [describing the *Palma* process]), the superior court agreed to address the anti-SLAPP motion on the parties' terms. We have not been called upon to address these procedures.

commercial, and estate letter targeted protected speech under the anti-SLAPP statute. The superior court viewed the letter as noncommercial speech unregulable under the CLRA and UCL. But it concluded the album packaging and video were commercial speech that, given Sony's stipulation, could be sufficiently false or misleading to permit Serova's lawsuit to proceed.

Sony appealed, but Serova did not, removing the estate's letter from the present dispute. (*Serova v. Sony Music Entertainment* (2018) 26 Cal.App.5th 759, 769–770 & fn. 5.) The Court of Appeal agreed with the superior court that Serova's challenges to the album packaging and video targeted Sony's protected speech. (*Id.* at pp. 772–773.) But it concluded this speech was more than mere commercial speech for purposes of the First Amendment and therefore immune from the statutes Serova had invoked. (*Id.* at pp. 773–781.) Accordingly, the Court of Appeal effectively directed judgment for Sony in full. (*Id.* at p. 782.)

We granted Serova's petition for review but paused all proceedings related to her petition for *FilmOn.com v. DoubleVerify, Inc.* (2019) 7 Cal.5th 133, which also concerned the anti-SLAPP statute and corporate speech. After resolving *FilmOn*, we transferred this case back to the Court of Appeal for reconsideration. When the Court of Appeal reached the same result, we again granted review.

After full briefing from the parties and amici curiae, and after oral argument in this court, Sony informed us that the parties "reached an agreement to settle the case independent of the outcome of the opinion from this Court, subject to the superior court's approval of the dismissal of the action pursuant

to California Rules of Court 3.770," governing dismissals of class actions. Serova responded, asking us to decide this matter because the settlement is not yet approved and because of the importance of the issues. Whether or not the yet-to-be-approved settlement moots the parties' dispute, we render this opinion "[i]n light of the important issues presented." (*Berroteran v. Superior Court* (2022) 12 Cal.5th 867, 877; see *State of Cal. ex rel. State Lands Com. v. Superior Court* (1995) 11 Cal.4th 50, 62.)

## II.     THE ANTI-SLAPP STATUTE

The anti-SLAPP statute enables courts, early in litigation, to strike meritless claims in lawsuits when those claims risk chilling "continued participation in matters of public significance." (§ 425.16, subd. (a); see *id.*, subds. (b)(1), (f).) "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Id.*, subd. (b)(1).) Thus, when a defendant seeks to strike a plaintiff's claim under the anti-SLAPP statute there are two inquiries: First, does the claim call for the anti-SLAPP statute's protections? Second, if so, does it have sufficient merit? (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.)

Typically, a defendant must establish the anti-SLAPP statute's applicability before the burden shifts and a plaintiff must establish a claim has sufficient merit. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) But only a claim " 'that satisfies *both*

prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute.'" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) Given this and "this court's 'inherent, primary authority over the practice of law,'" we may conclude a contested portion of an anti-SLAPP motion should be denied solely based on a plaintiff's showing of merit, as a sufficiently meritorious claim cannot be struck regardless of whether it arises from activity the anti-SLAPP statute protects. (*Ibid.*; see generally *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 7 [when one argument resolved a case, we did not need to discuss an alternative argument that would have led to the same result].) Considering Serova's showing of merit, we choose this approach.

## III.  SEROVA'S PROBABILITY OF PREVAILING

The parties' stipulation eases Serova's burden of showing she could prevail. Under it, she had to address only Sony's contentions that its challenged representations elude regulation because they are (1) noncommercial and enjoy heightened First Amendment protection, or (2) insufficiently false or misleading, even assuming Jackson did not sing lead vocals on the Cascio tracks. Although the superior court addressed both issues, the Court of Appeal addressed only the speech classification issue. The parties' petition and answer before this Court, as well as their briefing, omit the falsity issue. We likewise limit our discussion.

### A.  Commercial Speech Doctrine and Consumer Deception Laws

"[E]rroneous statement is inevitable in free debate . . . ." (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 271.) We therefore tolerate some falsehoods, even if they do not directly

advance society's interests.  (*United States v. Alvarez* (2012) 567 U.S. 709, 719 [invalidating a law criminalizing lies about having received congressional military decorations]; see generally *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 953 (*Kasky*).)

But under First Amendment[3] doctrine, "commercial speech that is false or misleading . . . 'may be prohibited entirely.' " (*Kasky*, *supra*, 27 Cal.4th at p. 953; see *id.* at p. 959; see also *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 501 [embracing regulation of "commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices"]; *Central Hudson*, *supra*, 447 U.S. at p. 563 ["there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity," thus "government may ban forms of communication more likely to deceive the public than to inform it"]; *Leoni v. State Bar* (1985) 39 Cal.3d 609, 624 [noting states can regulate " 'deceptive or misleading' " advertising, even if not " 'probably false, or even wholly false' "].)  This reflects the high court's view that the First Amendment, in the commercial sphere, aims to safeguard the flow of "accurate . . . information" to consumers.  (*Edenfield v. Fane* (1993) 507 U.S. 761, 766; see *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626, 651 ["extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides"]; *Central Hudson*, at p. 563

---

[3]     Sony has not argued the California Constitution's free speech clause, article I, section 2, requires a different analysis of whether its speech is commercial.  (See *Kasky*, *supra*, 27 Cal.4th at p. 959 ["This court has never suggested that the state and federal Constitutions impose *different boundaries* between the categories of commercial and noncommercial speech"].)

[reasoning the protection of commercial speech relates to "the informational function of advertising"].)

There are three common justifications for permitting greater regulation of commercial, as opposed to noncommercial, speech. First, commercial speech " 'may be *more easily verifiable by its disseminator*,' " who " 'presumably knows more about' " a " 'product or service . . . than anyone else.' " (*Kasky*, *supra*, 27 Cal.4th at p. 955.) Second, because profit motivates commercial speech, that speech is "*hardier*" — that is, less likely to suffer the chilling effect of regulation. (*Ibid.*) Third, prevention of commercial harm is a traditional and worthy goal of government. (*Ibid.*; *Cincinnati v. Discovery Network* (1993) 507 U.S. 410, 426.)

"[T]he category of commercial speech consists at its core of ' "speech proposing a commercial transaction." ' " (*Kasky*, *supra*, 27 Cal.4th at p. 956, quoting *Central Hudson*, *supra*, 447 U.S. at p. 562; see *44 Liquormart, Inc. v. Rhode Island, supra*, 517 U.S. at p. 499 [commercial speech is speech " 'linked inextricably' " with "commercial transactions"].) "[W]hen a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message." (*Kasky*, at p. 960, italics omitted.)

Serova alleges Sony's marketing of *Michael* violated the CLRA and the UCL. The CLRA (Civ. Code, §§ 1750 et seq.) prohibits sellers of consumer goods from representing that goods have "characteristics" they lack. (Civ. Code, § 1770, subd. (a)(5).) The UCL (Bus. & Prof. Code, §§ 17200 et seq.) proscribes

any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (*Id.*, § 17200; see *Kasky*, *supra*, 27 Cal.4th at pp. 949–950.) These statutes provide for, and Serova seeks, both injunctive and monetary relief. (Civ. Code, § 1780, subd. (a); Bus. & Prof. Code, § 17203; *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 371.)

Serova and Sony agree the CLRA and UCL — without distinguishing between the statutes' available remedies — can constitutionally restrict speech properly classified as commercial. They dispute, however, whether the album packaging and video for *Michael*, insofar as they make claims about Jackson's contributions to the album, are commercial or noncommercial speech under First Amendment doctrine.[4]

## B. Sony's Statements About *Michael* Are Commercial Speech

We start with Sony's promotion of *Michael* in the video and on the album's back as "a brand new album from the greatest artist of all time" with "9 previously unreleased vocal tracks performed by Michael Jackson." For the moment, we leave aside the other components of the album's packaging, the title and imagery.

### 1. Speaker and Audience

Sony, the speaker here, is promoting its album for sale. (See *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 948 [contrasting an online purveyor of

---

[4] At times, the parties discuss whether it would be fair to compel Sony to say the Cascio tracks "might not" contain Jackson vocals. But the precise issue presented here is whether the challenged marketing is commercial and can be subject to specific state law claims if false.

information about movies with those who sell films].) The audience for its promotional statements is potential purchasers of *Michael*, such as Serova, who will read the album's packaging while shopping or will watch the album's promotional video. So far, this is quintessential commercial speech. (*Kasky, supra*, 27 Cal.4th at pp. 960–961, 963; see *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1262 [treating product labeling as commercial speech]; *United States v. Edge Broadcasting Co.* (1993) 509 U.S. 418, 421 [treating broadcast advertising as commercial speech]; *Facenda v. N.F.L. Films, Inc.* (3d Cir. 2008) 542 F.3d 1007, 1018 [holding long-form promotional video for video game was commercial speech]; cf. *PPX Enters. v. Audiofidelity Enters.* (2d Cir. 1987) 818 F.2d 266, 272 ["A record album's cover . . . is one of the primary means of advertisement for a record album"].)

## 2. Content

Speech's content is typically commercial if it makes "representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents) . . . for the purpose of promoting . . . the speaker's products or services." (*Kasky, supra*, 27 Cal.4th at p. 961 [noting alcohol content listed on a beer bottle, descriptions of an attorney's qualifications, and advertisements showing prices of prescription drugs were all commercial].) A message that, for instance, identifies those affiliated with a product or service might be commercial. (*Id.* at p. 961; see *id.* at p. 969 [statement that cherries are picked by union workers would be commercial].)

Commercial speech routinely "relates to a matter of significant public interest or controversy." (*Kasky, supra*, 27

Cal.4th at p. 964.) "[M]any, if not most, products may be tied to public concerns" including "the environment, energy, economic policy, or individual health and safety." (*Central Hudson*, *supra*, 447 U.S. at p. 563, fn. 5.) Further, a "consumer's interest in the price, availability, and characteristics of products and services 'may be as keen, if not keener by far, than his interest in the day's most urgent political debate.' " (*Kasky*, at p. 965.)

Yet even when commercial speech touches on important public issues, "the State retains the power" to ensure commercial information flows " 'cleanly as well as freely.' " (*Central Hudson*, *supra*, 447 U.S. at p. 563, fn. 5.) Thus, "advertising that links a product to a current public debate," even an important one, is not immunized from regulation. (*Ibid.*; see *Kasky*, *supra*, 27 Cal.4th at p. 966; see *United States Healthcare, Inc. v. Blue Cross of Greater Philadelphia* (3d Cir. 1990) 898 F.2d 914, 937 ["advertisements for specific health care products do not escape the commercial speech category" simply because of the public interest surrounding them].) Further, consumer advertising does not lose its commercial character even if the speaker "has a secondary purpose to influence" discourse beyond the consumer realm. (*Kasky*, at p. 968.) "A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 68, fn. omitted; see *Zauderer v. Office of Disciplinary Counsel*, *supra*, 471 U.S. at p. 637, fn. 7 [holding otherwise protected speech about the legal rights of persons injured by a medical device is commercial speech when included in an advertisement].)

14

The commercial speech we identified in *Kasky* was a series of statements Nike made praising working conditions in its subcontractors' overseas factories. (*Kasky*, *supra*, 27 Cal.4th at pp. 947–948.) Nike's press releases, letters to newspapers and universities, public relations materials, and advertisements claimed that workers in these factories "are protected from physical and sexual abuse, that they are paid in accordance with applicable local laws and regulations governing wages and hours, that they are paid on average double the applicable local minimum wage, that they receive a 'living wage,' that they receive free meals and health care, and that their working conditions are in compliance with applicable local laws and regulations governing occupational health and safety." (*Id.* at p. 947.)

We concluded these representations, despite not pertaining to specific products and despite sometimes appearing outside traditional advertising formats, were commercial. (*Kasky*, *supra*, 27 Cal.4th at pp. 965–966; see *id.* at p. 976 (dis. opn. of Chin, J.).) Nike was "describing its own labor policies, and the practices and working conditions in factories where its products are made," which were "factual representations about its own business operations." (*Id.* at p. 963.) We further noted, "The wages paid to the factories' employees, the hours they work, the way they are treated, and whether the environmental conditions under which they work violate local health and safety laws, are all matters likely to be within the personal knowledge of Nike executives, employees, or subcontractors. Thus, Nike was in a position to readily verify the truth of any factual assertions it made on these topics." (*Ibid.*) Further, Nike's message sought to bolster consumer goodwill and shore up profits, and, if that message misrepresented how Nike's

products were being made, it was the sort of speech government has traditionally been empowered to regulate. (*Id.* at pp. 963–964.)

The content of Sony's statements on *Michael*'s packaging and in the video — made in traditional advertising contexts — strikes us as commercial. The statement on the back of Sony's album indicated that *Michael* "contains 9 previously unreleased vocal tracks performed by" Jackson; a statement about the album's characteristics that would induce purchases by those wishing to hear new Jackson vocals. The promotional video — which proclaimed the album as the newest "from the greatest artist of all time" alongside Jackson's name and likeness — also, concededly, conveys Jackson's vocal contributions and likewise would foster album sales amongst Jackson followers.

### 3. *Michael*, Though an Expressive Work, Is a Product for Sale.

Sony argues its statements promoting *Michael* convey noncommercial content because they pertain to art and identify an artist, whose identity "can be an important component of understanding the art itself." (*Serova*, *supra*, 44 Cal.App.5th at p. 130.) But if Sony's assertion that Jackson contributed lead vocals affects consumers' experience of *Michael*, this illustrates how misrepresentations about an artist's contributions can harm consumers in ways that matter to them.

"The purchaser of a novel is interested not merely, if at all, in the identity of the producer of the physical tome (the publisher), but also, and indeed primarily, in the identity of the creator of the story it conveys (the author)." (*Dastar Corp. v. Twentieth Century Fox Film Corp.* (2003) 539 U.S. 23, 33 (*Dastar*).) And "[t]he purchaser of a book, like the purchaser of

a can of peas, has a right not to be misled as to the source of the product." (*Rogers v. Grimaldi* (2d Cir. 1989) 875 F.2d 994, 997 (*Rogers*); see *Dastar*, at p. 38 [suggesting misrepresentations about the content of an artistic work could be false advertising under the federal Lanham Act];[5] *Murdock v. Pennsylvania* (1943) 319 U.S. 105, 111 [suggesting retailing and wholesaling of books via pamphlets, outside of proselytizing, are commercial enterprises].) "Movies, plays, books, and songs," though themselves protected artistic works, "are also sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation." (*Rogers*, at p. 997.) Indeed, the dividing line between artistic and utilitarian goods may sometimes blur. (See Rothman, *Was Steve Jobs an Artist?* (Oct. 14, 2015) The New Yorker

---

[5] *Dastar* initially addressed the Lanham Act's prohibition, in section 43(a)(1)(A) (15 U.S.C. § 1125(a)(1)(A)), on confusing designations of a good's origin. It held the origin of an artistic work, under that section, is the origin of the physical embodiment of the work, not the artist. Thus, there could be no Lanham Act section 43(a)(1)(A) claim for failure to attribute a work. But, if an artistic work's advertiser gave purchasers false impressions of the work, then there might be "a cause of action — not . . . under the 'confusion . . . as to the origin' provision of § 43(a)(1)(A), but for misrepresentation under the 'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)." (*Dastar*, *supra*, 539 U.S. at p. 38; see generally 5 McCarthy on Trademarks and Unfair Competition (5th ed. June 2022 update) § 27:85 [discussing *Dastar*]; U.S. Copyrights Office, Register of Copyrights, Authors, Attribution, and Integrity: Examining Moral Rights in the United States (Apr. 2019) p. 55 [same].) *Dastar*, in interpreting the Lanham Act's scope, never suggested a First Amendment concern with applying that law, or any other consumer protection law, to expressive works.

<https://www.newyorker.com/culture/cultural-comment/was-steve-jobs-an-artist> [as of Aug. 18, 2022] [discussing the intersection of art and technology products].)[6]

Relief has long been available in California to unwitting purchasers of imitation art who relied on false representations about authenticity. (E.g., *Smith v. Zimbalist* (1934) 2 Cal.App.2d 324, 326, 332–333 [finding unenforceable the sale of a violin represented as a Stradivarius when buyer and seller were both mistaken and the violin was a cheap copy].)

Additionally, numerous courts have entertained false advertising claims premised on statements about creative contribution. (E.g., *Aalmuhammed v. Lee* (9th Cir. 2000) 202 F.3d 1227, 1237 [reversing dismissal of a writer's California UCL claim accusing another writer of plagiarizing his work]; *King v. Innovation Books* (2d Cir. 1992) 976 F.2d 824, 829 [allowing Stephen King to enjoin, under the Lanham Act, a film distributor from describing a film, The Lawnmower Man, as Stephen King's The Lawnmower Man, where King had no involvement in the creative process except for selling his rights to his short story of the same name]; *PPX Enters. v. Audiofidelity Enters.*, *supra*, 818 F.2d at p. 268 [affirming a jury verdict of Lanham Act false advertising when a record company marketed "eight albums purporting to contain feature performances by Jimi Hendrix, but which either did not contain Hendrix performances at all or contained performances in which Hendrix was merely a background performer or undifferentiated session player"]; *Benson v. Paul Winley Record*

---

[6] All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

*Sales Corp.* (S.D.N.Y. 1978) 452 F.Supp. 516, 518 [holding that misleading attributions on a record jacket might not only confuse consumers under the Lanham Act but also harm a performer's reputation[7]].) The use of an artist's name in advertising "should usually qualify as a use 'in commercial advertising or promotion' " under the Lanham Act. (5 McCarthy on Trademarks and Unfair Competition, *supra*, § 27:85; see 1 McKenney & Long, Federal Unfair Competition: Lanham Act 43(a) (Dec. 2021 update) § 7:7, fn. 2 [collecting further cases].)[8]

Moreover, courts have recognized other causes of action could be viable where disputes about creative contribution form the basis of suit. (E.g., *Aalmuhammed v. Lee*, *supra*, 202 F.3d

---

[7] As to artistic reputation, if Jackson's estate believed another music publisher were selling subpar recordings and erroneously attributing the lead vocals to Jackson, one could imagine the estate filing its own false advertising suit and asserting it was challenging commercial speech. The risk of such reputational harm "is particularly acute in the arts and entertainment industries, in which the marketability of a person's goods or services is in large measure dependent upon recognition for past achievements." (Rest.3d Unfair Competition, § 5, com. c., p. 58.) We have held, moreover, a celebrity may assert violations of publicity rights if another's use of the celebrity's name or likeness in an expressive work is not transformative — that is, does not add some sufficient new meaning or expression. (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 405 [a T-shirt artist's use of an image he created of The Three Stooges]; accord, *Hart v. Elec. Arts, Inc.* (3d Cir. 2013) 717 F.3d 141, 170 [a videogame's use of an athlete's name and likeness].)

[8] Though the reasoning of some of these Lanham Act cases may not survive *Dastar*'s narrowing of what origin-of-goods claims may entail, many feature false advertising claims still potentially cognizable under the act or possibly other laws. (See *ante*, fn. 5.)

at pp. 1230–1236 [rejecting claim of joint authorship under copyright law]; *Silverstein v. Penguin Putnam, Inc.* (2d Cir. 2004) 368 F.3d 77, 81 [concluding a collector of Dorothy Parker poems could not credibly assert he exercised, in assessing whether poems were written by Parker, originality sufficient to merit copyright protection].)

None of these cases hints that product-touting statements about artistic contribution are, by their nature, noncommercial or otherwise beyond traditional consumer protection regulations on constitutional grounds. In contrast, *Rogers*, *supra*, 875 F.2d 994 and its progeny have considered the First Amendment and applied the federal false advertising statute not to mere promotional materials for expressive works but to their titles. Ginger Rogers, one of those rare entertainers "readily called to mind by just their first names," sued film producers over Ginger and Fred, a film about a fictious cabaret duo in Italy who earned the nickname Ginger and Fred. (*Rogers*, at p. 996.) Rogers invoked the Lanham Act, claiming the film title falsely implied it was about her or that "she sponsored, endorsed, or was otherwise involved in the film." (*Id.* at p. 997.) Though the Second Circuit rejected liability against the film's producers, it concluded titles of expressive works have a commercial component, and the First Amendment would, in some cases, pose no barrier to regulating them. (*Id.* at p. 998.) For instance, *Rogers* reasoned if a title has no artistic relevance to its work, or if an artistically relevant title nonetheless explicitly misleads as to the work's source or content, regulation could ensue. (*Id.* at pp. 997–999.) Thus, said the court, a title that falsely conveyed someone authored a work had a sufficient commercial aspect and could be prohibited. (*Id.* at p. 999 [suggesting " 'Nimmer on Copyright' " or " 'Jane Fonda's Workout Book' " conveyed

representations to consumers].) At least one precept from *Rogers* — the regulability of explicitly misleading titles — appears to have met acceptance amongst California appellate courts. (*Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 588, 590; see *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1039, fn. 8.)

The reasons commonly given for why commercial speech is subjected to greater regulation — a commercial speaker's close relationship to a product or service, profit motive, and the government's traditional role in preventing commercial harm (*Kasky*, *supra*, 27 Cal.4th at p. 955) — still have relevance when an artistic product is marketed. We would not want false advertising laws to stifle the next great album or medical advance. But consumer protection remains important in both arenas, as it does in others. Indeed, the United States Supreme Court has allowed prohibition of false commercial speech in categorical terms, never embracing a wholesale exemption for entire classes of goods or services. (See *Kasky*, *supra*, 27 Cal.4th at pp. 953–954 [citing cases].) And despite the long history of cases entertaining false advertising claims premised on representations about artistic contribution, we have been presented no evidence of a chilling effect on the for-profit creative industry.

There may be instances where statements about artistic contribution, or artistic works more generally, are not offered to convey product information but are themselves part of an expressive enterprise, possibly parody or satire. (See, e.g., *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 57 [attributing a made-up, salacious interview to a nationally known minister was protected parody]; *Mattel Inc. v. Walking Mt. Prods.* (9th Cir. 2003) 353 F.3d 792, 812 [concluding "[p]arody is a form of

noncommercial expression if it does more than propose a commercial transaction"].) And it is conceivable that an album seller might include, in liner notes, an essay theorizing about artistic contributions that is itself an expressive work. (See *Armstrong v. Eagle Rock Entm't, Inc.* (E.D.Mich. 2009) 655 F.Supp.2d 779, 787 [extending 1st Amend. protection to a liner-note essay about the history of a jazz festival].) And artists might choose to obscure their identities for expressive reasons through pen names or pseudonyms. But the case before us does not raise these or other like scenarios. Instead, having put *Michael*'s title and artwork aside for the moment, this case concerns an explicit promise of a superstar's vocal contributions to a product. We, again, view this as commercial content.

### 4. Sony's Speech Is Not Inextricably Intertwined with or Adjunct to an Expressive Work.

Sony alternatively contends that if its representations about *Michael* seem commercial, they are nonetheless so connected with fully protected, noncommercial speech — *Michael*'s musical content — that they must be treated as, and receive the heightened protection due, noncommercial speech. But, like the Court of Appeal below (*Serova, supra*, 44 Cal.App.5th at p. 131, fn. 19), we do not see the requisite connection.

Sometimes speech will have commercial and noncommercial components. If a legal command or law of nature makes it "impossible" to separate the commercial components from the noncommercial, the two are " 'inextricably intertwined,' " and we bestow noncommercial status on both components. (*Board of Trustees, State Univ. of N. Y. v. Fox* (1989) 492 U.S. 469, 474.) This principle derives from *Riley v. National Federation of Blind* (1988) 487 U.S. 781, in which a

state had required conceded noncommercial speech (charitable solicitations by professional fundraisers) to include assumed commercial speech (a disclosure of the percentage of contributions retained by those professionals). Because state law required the commercial disclosure, that disclosure, held the high court, was "inextricably intertwined" with the noncommercial solicitation and lost "its commercial character," such that the disclosure requirement was subject to "exacting First Amendment scrutiny." (*Riley,* at pp. 796, 798; see *Fox*, at p. 474.)

We considered entwinement in *Kasky* but found none. "No law required Nike to combine factual representations about its own labor practices with expressions of opinion about economic globalization, nor was it impossible for Nike to address those subjects separately." (*Kasky*, *supra*, 27 Cal.4th at p. 967.) We further held, "Nike may not 'immunize false or misleading product information from government regulation simply by including references to public issues.' " (*Id.* at p. 966.) The "alleged false and misleading statements" conveyed a commercial message about how Nike's products were made. (*Ibid.*)

Apart from the entwinement concept is the notion that advertising adjunct to an expressive work should at times enjoy the same protected status as that work. Several Courts of Appeal have held the truthful use of a name and likeness to promote an expressive work cannot support a claim for violation of the right of publicity. (E.g., *De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 862 [name of Olivia De Havilland to promote a program about her]; *Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 325 ["photographs of an actor resembling an actual personage to

promote a fictional work" about that personage]; *Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 797 ["a newspaper has a constitutional right to promote itself by reproducing its originally protected articles or photographs"].) But another court has held where advertisements "did not reflect any character or portion of" an expressive work and instead "contained a fictitious critic's favorable opinion," the advertisements were not entitled to heightened protection as adjuncts to an expressive work and were instead subject to consumer protection laws. (*Rezec v. Sony Pictures Entertainment, Inc.* (2004) 116 Cal.App.4th 135, 142–143 [rejecting a regime in which film advertisements would evade consumer protection laws when traditionally utilitarian products would not]; cf. *Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1229 (*Keimer*) [holding that even promotional materials on book cover reflecting false claims of book could be commercial speech].)[9]

The Ninth Circuit addressed both entwinement and advertising adjunct to expressive works in *Charles, supra*, 697 F.3d 1146. It held that although a television program was itself noncommercial, expressive speech, a billboard advertising

---

[9]    *Keimer*, which involved advertising material on a book cover excerpted directly from the book's text (*Keimer, supra*, 75 Cal.App.4th at pp. 1225, 1233), has been criticized as insufficiently protective of free speech (e.g., *Lacoff v. Buena Vista Publ'g, Inc.* (2000) 705 N.Y.S.2d 183, 191 [183 Misc.2d 600, 610] [classifying the identical advertising material as noncommercial and expressly rejecting *Keimer*]). Given Sony's advertising does not reproduce the music on *Michael*, we need not address this criticism of *Keimer*, or, for that matter, address the full contours of a doctrine governing the promotion of expressive works. (See *Charles v. City of Los Angeles* (9th Cir. 2012) 697 F.3d 1146, 1155 (*Charles*) [noting the conflict].)

the program was commercial speech and did "not present intertwined speech." (*Id.* at p. 1152.) The program's protected status did "not cloak all advertisements for the program with noncommercial status," because "speech inviting the public to watch" a program "is not inherently identical to the speech that constitutes the program itself." (*Ibid.*) The Ninth Circuit separately observed that the principle motivating California's protection of advertisements adjunct to expressive works "is the need to protect advertisers from tort actions that would otherwise threaten the ability of publishers to truthfully promote particular works" by accurately conveying the content of those works, even when that content is itself false. (*Id.* at p. 1155.) An adjunct advertisement doctrine, it asserted, would be "justified only to the extent necessary" to achieve this purpose. (*Id.* at p. 1156; see *Cher v. Forum Int'l, LTD* (9th Cir. 1982) 692 F.2d 634, 639 [viewing tabloid magazine headlines, cover content, and advertising inserts as potentially "adjunct" to an article within the magazine but refusing to protect "patently false" representations].)

We conclude Sony's identification of Jackson as lead vocalist is not inextricably intertwined with the music on *Michael* or any of the album's arguably expressive elements. No legal command nor law of nature compelled Sony to include what, for present purposes, it concedes are false claims about the Cascio tracks or to market the album with a video commercial. It was hardly "impossible" (*Kasky*, *supra*, 27 Cal.4th at p. 967) for Sony to market *Michael* without these statements. Additionally, Sony's alleged false representations are distinct from, rather than adjunct to or reflective of, any artistic expression on *Michael*. Serova is not suing because *Michael*'s artistic expression has spilled over into promotional

advertising, but because she believes Sony falsely advertised the lead vocalist. (See *Charles*, *supra*, 697 F.3d at pp. 1154–1155.) Thus, even if we fully embraced the proposal to limit claims premised on the truthful advertising of expressive works, that limit would not apply to Serova's claims. To invoke the entwinement or adjunct advertising doctrines here would, in our view, strike the wrong balance between the interests of consumers and those of sellers advertising expressive works.

### 5. Sony's Lack of Knowledge Does Not Decommercialize Its Speech.

Sony offers a broader argument why its statements about Jackson's artistic contributions should not be viewed as containing commercial content. Sony argues the truth of its statements was not readily verifiable and thus Sony, though it knew of the controversy over the Cascio tracks, lacked knowledge of falsity. The Court of Appeal embraced this argument, concluding Sony's statements were not commercial because they "lacked the critical element of personal knowledge under the *Kasky* standard." (*Serova*, *supra*, 44 Cal.App.5th at p. 127; see *id.* at pp. 128–129 & fn. 12.) We disagree.

"Apart from . . . the identities of the speaker and the audience, and the contents of the speech," *Kasky* found "nothing in the United States Supreme Court's commercial speech decisions that is essential to a determination that particular speech is commercial in character in the context of a consumer protection law intended to suppress false or deceptive commercial messages." (*Kasky*, *supra*, 27 Cal.4th at p. 962.) Nor does *Kasky*'s definition of commercial content — "representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents) . . . for the purpose of promoting . . . the

speaker's products or services" (*id.* at p. 961) — mention a requirement that particular representations be made with personal knowledge or be readily verifiable.

*Kasky*, in more expansively viewing commercial speech as potentially including letters and press releases, saw its "understanding of the content element of commercial speech" as "consistent" with the traditional explanations for "denying First Amendment protection to false or misleading commercial speech." (*Kasky*, *supra*, 27 Cal.4th at p. 962.) One such explanation is that " 'truth of commercial speech . . . *may* be more easily verifiable by its disseminator . . . in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and *presumably* knows more about than anyone else.' " (*Id.* at p. 955, italics added & omitted, quoting *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. at p. 772, fn. 24.) "This explanation," continued *Kasky*, "assumes that commercial speech consists of factual statements and that those statements describe matters within the personal knowledge of the speaker or the person whom the speaker is representing." (*Kasky*, *supra*, 27 Cal.4th at p. 962.)

Undoubtedly, commercial statements are sometimes made with personal knowledge. But a "may be more easily verifiable" rationale does not, with words such as "may," "ordinarily," and "presumably," impose either a personal knowledge requirement or a requirement that a particular statement be readily verifiable. (See *Kasky*, *supra*, 27 Cal.4th at p. 955.) To the contrary, the rationale presumes that sometimes commercial speech may *not* be more easily verifiable or may *not* be known to the speaker as true or false. In all events, the rationale, in offering a justification for greater

regulation of commercial speech generally, does not serve as a litmus test for classifying speech in a particular instance. (See *id.* at p. 957 [highlighting the flexible nature of the commercial speech inquiry].)

Thus, while *Kasky* identified the scenario in which commercial speech is within the speaker's personal knowledge, *Kasky* went on to say the "may be more easily verifiable" explanation implied the very definition of commercial content just announced — that is, promotional representations of fact about the business, products, or services of a speaker or whoever the speaker represents. (*Kasky*, *supra*, 27 Cal.4th at pp. 955, 961–962.) Consistent with this, our primary basis for concluding Nike's speech had commercial content was its connection to Nike's "own business operations." (*Id.* at pp. 963, 964.) This was so even though Nike's representations addressed factories run not by its employees, but its subcontractors (*id.* at pp. 955, 962–963), and matters only "*likely* to be within the personal knowledge" of those subcontractors, which suggested only that "Nike was *in a position* to readily verify" its assertions (*id.* at p. 963, italics added). By alluding to likely knowledge and potential verifiability to bolster its conclusion that Nike's speech was commercial, *Kasky* did not establish a knowledge or verifiability requirement. (See *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1076 [" 'an opinion is only authority for those issues actually considered or decided' "].) Nor has this court or the high court otherwise imposed such requirements.

Moreover, it seems problematic to assess the commercial or noncommercial content of speech by measuring a speaker's level of personal knowledge. For example, if we correlate knowledge with commercial speech, then two identical promotional statements might face differing regulations

because of something invisible to consumers: the speaker's mental state. (*People v. Superior Court* (*Olson*) (1979) 96 Cal.App.3d 181, 191, 195 [injury to consumers is the same regardless of what an advertiser knows]; accord *P&G v. Amway Corp.* (5th Cir. 2001) 242 F.3d 539, 552, fn. 26 [speech's commercial status is established "regardless of [a speaker's] knowledge of falsity"].) Also, if actual knowledge were the standard, that knowledge could be easily avoided. Sellers making claims about their offerings surely do not avoid false advertising regulation, or have their claims treated as noncommercial speech, by scrupulously declining to verify those claims or to acquire knowledge. A knowledge test would undermine false advertising law and reward turning a blind eye.

Correlating commercial speech with a statement's verifiability presents similar problems. Illustrating the tenuous correlation, at least one Court of Appeal employing *Kasky* has classified advertising claims that appear unverifiable or difficult to verify as commercial speech, reasoning claims that professionals had " ' "the highest ethical and moral standards" ' " or were " ' "dedicated to neutrality, integrity, honesty" ' " were meant to influence consumers about services for sale. (*JAMS, Inc. v. Superior Court* (2016) 1 Cal.App.5th 984, 995 (*JAMS*) [but stating whether that speech, puffery in the eyes of the speaker, was actionable was a separate question].)[10] At the same time, consumer protection laws "serve the purpose of commercial speech protection" by encouraging a

---

[10] In *JAMS*, the Court of Appeal concluded the speech was commercial under section 425.17, which, as explained above, exempts certain claims arising from commercial speech from the reach of the anti-SLAPP statute. In doing so, it employed *Kasky*'s framework. (*JAMS, supra*, 1 Cal.App.5th at p. 994.)

seller "to make greater efforts to verify the truth of its statements." (*Kasky*, *supra*, 27 Cal.4th at pp. 963–964.) And it is when statements about products or services are hard to verify that the need for consumer protection may be strongest. (See *Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 366 [advertising claims "not susceptible of precise measurement or verification . . . might well be deceptive or misleading to the public, or even false"]; see also *California Dental Assn. v. FTC* (1999) 526 U.S. 756, 773–774 [noting the possible goal of "promoting competition by reducing the occurrence of unverifiable and misleading across-the-board discount advertising"].) Indeed, the high court has not deployed verifiability to distinguish between commercial and noncommercial speech but to discuss whether truthful commercial speech is nonetheless sufficiently misleading to warrant a state's "categorical ban." (*Peel v. Attorney Disciplinary Comm'n of Ill.* (1990) 496 U.S. 91, 100.)

Ultimately, then, otherwise commercial speech does not lose its commercial nature simply because a seller makes a statement without knowledge or that is hard to verify.

Even assessing the potential verifiability of Sony's claims in line with the verifiability justification for regulation of commercial speech, whether Jackson sang lead vocals on the Cascio tracks "may be more easily verifiable" (*Kasky*, *supra*, 27 Cal.4th at p. 955, italics omitted) by Sony in exactly the sense that justifies commercial speech regulation more broadly. Sony's claims relate directly to its product. Few were likely better positioned to identify the Cascio tracks' singer than *Michael*'s producers and sellers, who had not only profit motive, but also access to and business dealings with the album's primary creators. Further, Sony had the incentive to secure any

necessary licenses or rights, and, as prudent, warranties of authenticity.[11] (Cf. *Kasky, supra*, 27 Cal.4th at p. 963 [noting "Nike was in a position to readily verify" those things its contractors "likely" knew].) Sony, before releasing *Michael*, conducted research and allegedly had "complete confidence" in, and indeed noted "overwhelming objective evidence" of, the authenticity of Jackson's vocals, a message at least in tension with its present claim that verifiability was unattainable.

Notwithstanding Sony's temporary concession that its statements about Jackson's contributions turned out to be false, it remains that experts allegedly disagree on who sang the Cascio tracks. But expert disagreement about the characteristics of a product does not change the fact that a seller " 'presumably knows more about' " its product " 'than anyone else.' " (*Kasky, supra*, 27 Cal.4th at p. 955.) Such expert disagreements, even if they portend verifiability or knowledge issues and possibly difficulties of proof at trial, do not render a seller's promotional speech noncommercial and, for that reason, constitutionally insulated from false advertising laws. And as discussed above, advertising does not shed its commercial status though it touches or links a product to an important public debate. (*Central Hudson, supra*, 447 U.S. at p. 562, fn. 5; *Kasky, supra*, 27 Cal.4th at p. 966; *Eastman Chem. Co. v. PlastiPure, Inc.* (5th Cir. 2014) 775 F.3d 230, 236 ["Advertisements do not

---

[11] Presumably, Sony would seek to invoke any warranties, or assert fraud or other claims, against Cascio and his associates if it believed they peddled fake recordings.

become immune from . . . scrutiny simply because their claims are open to scientific or public debate"].)[12]

Our conclusion would not foreclose Sony, despite its present willingness to concede falsity, from later attempting to argue its statements are insufficiently false or misleading statements of fact to be regulable under the CLRA or UCL. But the separate inquiry into liability, on which we express no opinion, is different from the speech classification issue before us now. (See *Kasky*, *supra*, 27 Cal.4th at p. 970 [noting the falsity inquiry is separate]; *id.* at p. 974, fn. 2 (dis. opn. of Chin, J.) ["Whether a company's statements are allegedly false or misleading does not determine the threshold question" of "whether the speech is commercial or noncommercial"]; *JAMS*, *supra*, 1 Cal.App.5th at p. 995 [whether statements are true "goes to the issue of whether or not [plaintiff] can prevail on his claim, not to whether the statements qualify as commercial speech" as that term is understood].)

## 6. Strict Liability Regulation of Commercial Speech Is Common.

Offering a variation on its verifiability and knowledge argument, Sony argues we should classify its alleged misrepresentations about *Michael* as noncommercial because regulating them on a strict liability basis, as Serova seeks to do

---

[12] We caution that our discussion of potential verifiability is not based on a developed factual record, and we express no opinion on whether Sony could have actually verified the Cascio tracks' vocals. Verifiability as a potential requirement for commercial speech only factored into the Court of Appeal's decision, not the superior court's, and the parties, as evidenced by their issue-limiting stipulation, saw no need to conduct discovery concerning verifiability or any other matters related to Sony's motion. (See *ante*, fn. 2.)

under the CLRA and UCL,[13] would unduly "chill expression" in a way inconsistent with traditional government regulation.

Yet "[s]trict liability regimes regulating commercial speech" are not anomalous but consistent with traditional notions of government's regulatory role. (*American-Arab Anti-Discrimination Comm. v. City of Dearborn* (6th Cir. 2005) 418 F.3d 600, 611, fn. 7.) A hundred years ago, states, in their early efforts to curtail false advertising, enacted variants of a model statute criminalizing "'untrue, deceptive or misleading'" advertisements. (Comment, *Untrue Advertising* (1927) 36 Yale L.J. 1155, 1156, fn. 6 (*Untrue Advertising*).) This Printer's Ink Model Statute,[14] and a majority of the states implementing it, imposed "absolute responsibility," even absent "knowledge or intent to deceive." (*Untrue Advertising*, at p. 1157 & fn. 12; see *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 305, fn. 11 [discussing the model statute in relation to California's UCL and the state's other, more modern consumer protection laws, but noting California's 1915 version of the model statute required negligence regarding falsity].)

We have already explained why *Kasky* does not make a speaker's knowledge of truth or falsity the determiner of speech's commercial status. Additionally, the disagreement in *Kasky* between the majority, which found Nike's speech

---

[13] Neither party, nor any of the amici curiae, contends the CLRA or UCL, when applied to alleged false advertising, requires proof of a defendant's knowledge.

[14] The model statute was "drawn up in 1911 by Mr. Harry D. Nims at the instance of *Printer's Ink*, a magazine published for advertisers." (*Untrue Advertising, supra*, 36 Yale L.J. at p. 1157.)

regulable, and the dissents was, as the dissenters framed it, not whether the First Amendment permitted strict liability for false advertising, but what kind of corporate speech should be deemed "commercial" and therefore subject to such regulation. (*Kasky*, *supra*, 27 Cal.4th at pp. 983–984, 996 & fn. 8. (dis. opn. of Brown, J.); *id.* at pp. 979–980 (dis. opn. of Brown, J.) ["If Nike's press releases, letters and other documents are commercial speech, then the application of . . . strict liability for false and misleading ads — is constitutional"]; *id.* at p. 971 (dis. opn. of Chin, J.) [warning strict liability would apply to Nike if its speech were commercial].)

Further, the CLRA and UCL provisions that Serova invokes have kinship with section 43(a) of the Lanham Act, which prohibits, on a strict liability basis, false designations of the origin of goods, services, or commercial activities as well as false advertising. A Lanham Act false advertising claim, which must target "commercial advertising or promotion" (15 U.S.C. § 1125(a)(1)(B), "exists regardless of whether . . . the defendant acted willfully or with intent to deceive" (2 Callmann on Unfair Competition, Trademarks, and Monopolies (4th ed., June 2022 update) § 5:3). "The deceptive or misleading quality of an advertisement is not vitiated by the advertiser's good faith and, accordingly, intent to deceive is not an element of the violation. An innocent state of mind does not diminish the false advertiser's unfair advantage over competitors." (*Ibid.*, fns. omitted; see *Romag Fasteners, Inc. v. Fossil, Inc.* (2020) __ U.S. __, __ [140 S.Ct. 1492, 1495] [the Lanham Act's "language has *never* required a showing of willfulness to win a defendant's profits," and its silence regarding a mental state is striking in a statute that, elsewhere, "often and expressly" incorporates them].)

Strict liability under the Lanham Act has been held consistent with the First Amendment. (E.g., *United States Healthcare, Inc. v. Blue Cross of Greater Philadelphia, supra,* 898 F.2d at p. 937 ["the First Amendment requires no higher standard of liability than that mandated by the substantive law," namely the Lanham Act, such that a heightened "actual malice" standard would not apply]; *P&G v. Amway Corp., supra,* 242 F.3d at p. 557 ["false commercial speech cannot qualify for the heightened protection of the First Amendment," and neither actual malice nor negligence must be shown to prove a Lanham Act claim]; see *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 683 [citing *P&G*].)

Similarly, the Federal Trade Commission Act (15 U.S.C. §§ 43, 52) has widely been held to prohibit an advertiser's deceptive acts regardless of good faith. (*Fed. Trade Comm'n v. Algoma Co.* (1934) 291 U.S. 67, 81 [the act applies to representations "however innocently made"]; *Curtis Lumber Co. v. La. Pac. Corp.* (8th Cir. 2010) 618 F.3d 762, 779 & fn. 14 [collecting cases]; see generally Pridgen & Alderman, Consumer Protection and the Law (Nov. 2021) § 10:2 ["the Commission and the courts have concluded that the seller's intent is irrelevant to a finding that a deceptive trade practice has been committed"].)

In contrast to these regulations of commercial speech, the First Amendment requires state laws impinging on certain *noncommercial* speech to include fault-based liability. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 347 [defamation of private individuals requires "fault"]; *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279–280 [defamation of a public official requires actual malice]; *Smith v. California* (1959) 361 U.S. 147, 154 [banning the mere possession for sale of obscene books limits the nonobscene books a bookseller will review and

sell, and thus the government must insist on some "mental element" for criminal liability].)

But "the leeway for untruthful or misleading expression that has been allowed in [these] other contexts has little force in the commercial arena." (*Bates v. State Bar of Arizona*, *supra*, 433 U.S. at p. 383; see *Kasky*, *supra*, 27 Cal.4th at pp. 953–954 [quoting *Bates*].)  "Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech.  [Citation.]  And any concern that strict requirements for truthfulness will undesirably inhibit spontaneity seems inapplicable because commercial speech generally is calculated.  Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability." (*Bates*, at p. 383.)

In line with these principles, the numerous cases described *ante* at pages 18 through 21 have long applied the UCL and Lanham Act to representations about contributions to artistic works and did so without assessing scienter. (See, e.g., *King v. Innovation Books*, *supra*, 976 F.2d at p. 829; *PPX Enters. v. Audiofidelity Enters.*, *supra*, 818 F.2d at pp. 268, 273; *Rogers*, *supra*, 875 F.2d 994.)  If the CLRA and UCL lack a scienter requirement, we still classify Sony's speech as commercial.

## C.    Sony's Album Title and Artwork

Serova has sufficiently established, in connection with the anti-SLAPP inquiry into the merits of her claims, that Sony's promise of "9 previously unreleased vocal tracks performed by Michael Jackson" and its promotional video are commercial speech regulable under the CLRA and UCL.  We turn briefly to

address the album's title, *Michael*, and its artwork, containing images of Jackson.

As already noted, some courts view titles as integral to "expression as well as a significant means of marketing." (*Rogers*, *supra*, 875 F.2d 994, 998 ["The artistic and commercial elements of titles are inextricably intertwined"].) Album art might also be expressive. (Compare *Winchester Mystery House, LLC v. Global Asylum, Inc.*, *supra*, 210 Cal.App.4th at p. 592 [applying heightened scrutiny to trademark claims targeting artwork on DVD packaging] with *No Doubt v. Activision Publishing, Inc.*, *supra*, 192 Cal.App.4th at p. 1039, fn. 8 [doubting whether such heightened scrutiny should apply to a claim that use of a celebrity's likeness in a video game was actionable as a misappropriation].)

Given the framing of Sony's anti-SLAPP motion, however, and the conclusions we have reached so far, we do not address whether *Michael*'s artwork and title are commercial speech or possess expressiveness that might impact their classification or otherwise limit their regulability under state law.

Sony's initial memorandum of points and authorities supporting its motion did not address the artwork and title, even though Serova's complaint noted these items as relevant to her claims. Sony, discussing what it called its "attributional statements," analyzed only the album-back statement and video. Serova, in opposition, referred to the album's artwork and title and asserted those items were misleading, but grouped them with the album-back statement for the commercial speech analysis. Consistent with this, Serova argued elsewhere that all components of the album's packaging should, in evaluating its claims, be "taken together" and viewed "as a whole." Sony,

replying on the commercial speech issue, followed suit and discussed the album's "CD case" as a whole, not singling out the artwork or title for separate treatment. It instead asserted "what the court must decide" is whether a statement of artistic contribution is commercial speech and argued, "Naming Jackson the performer of the tracks at issue is noncommercial." The parties' issue-limiting stipulation, meanwhile, while acknowledging Serova's claims arose from "various representations," only sought a determination of whether Serova could "allege facts sufficient to constitute a cause of action under" the CLRA or UCL. When the superior and appellate courts below ruled on Sony's motion and the commercial speech issue, neither considered possible doctrinal wrinkles related to artwork or titles for expressive works and neither applied a unique analysis to them. (See *Serova, supra*, 44 Cal.App.5th at pp. 126–132.)

Sony's motion, then, as limited by the parties' stipulation, does not now require a stand-alone assessment of the commercial nature of *Michael*'s artwork and title, especially in light of Serova's showing that the album packaging contains speech "naming Jackson the performer" of the Cascio tracks that is commercial and can thus support a cause of action under the CLRA and UCL. Consistent with our long-standing preference for narrower resolutions of constitutional questions (see *People v. Hoyt* (2020) 8 Cal.5th 892, 949; cf. Cal. Rules of Court, rule 8.516(b)(3) [this court retains discretion over the issues to decide]), we do not consider how to address the artwork and title consistent with First Amendment dictates.

### D.   Copyright Preemption

There is one final matter, however, to address regarding the merits of Serova's claims.  In its answering brief in this court, Sony argues, for the first time, that Serova's consumer deception claims are meritless because federal copyright law preempts them and deprives California courts of subject matter jurisdiction.  Sony believes it can argue preemption now, despite the parties' issue-limiting stipulation and the preliminary nature of an anti-SLAPP motion, because challenges to a court's subject matter jurisdiction can be raised at any time and because subject matter jurisdiction " ' "cannot be conferred by waiver, estoppel, or consent." ' "  (See *Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 339.)  Serova does not dispute Sony's framing of its preemption argument as jurisdictional.  She has, in fact, briefed the issue without objecting to us considering it.  Whether or not Sony's preemption claim tests our fundamental jurisdiction, we, out of an abundance of caution, choose to consider it, and we reject it.

Copyright law is held to preempt state claims when state claims vindicate rights equivalent to those copyright law protects.  (17 U.S.C. § 301(b)(3); see *Kodadek v. MTV Networks, Inc.* (9th Cir. 1998) 152 F.3d 1209, 1212.)  Copyright law protects copyright owners against unauthorized reproduction, distribution, and other uses of their works (17 U.S.C. § 106) but does not speak to false advertising and consumer confusion as the CLRA and UCL do (Civ. Code, § 1770, subd. (a)(5) [prohibiting misrepresentations about goods' characteristics]; Bus. & Prof. Code, § 17200 [prohibiting "deceptive, untrue or misleading advertising"]).  When a consumer brings a CLRA or UCL claim requiring proof of false or misleading advertising, the claim requires something a copyright claim does not.  (See

*Kabehie v. Zoland* (2002) 102 Cal.App.4th 513, 530 [noting the
" ' "extra element of misrepresentation" ' " distinguishes a fraud
claim from a copyright claim]; *Gladstone v. Hillel* (1988) 203
Cal.App.3d 977, 987 [same]; accord, *Computer Mgmt. Assistance
Co. v. Robert F. DeCastro, Inc.* (5th Cir. 2000) 220 F.3d 396, 404
[Louisiana Unfair Trade Practices Act requires proof of
misrepresentation, an " 'extra element' "]; *Samara Bros. v. Wal-
Mart Stores, Inc.* (2d Cir. 1998) 165 F.3d 120, 131 [New York
consumer claim requiring consumer confusion and "deceptive
acts," even if unintentional, was not preempted]; *Valente-Kritzer
Video v. Pinckney* (9th Cir. 1989) 881 F.2d 772, 776 ["the
element of misrepresentation . . . distinguishes [a California
fraud] claim from one based on copyright"]; *Meyers v. Fabrics*
(1985) 65 N.Y.2d 75, 78 [479 N.E.2d 236, 238] [a New York
"cause of action for false labeling" was not preempted].) In fact,
state laws that "prevent consumer confusion" and prohibit "false
descriptions" of products have long "coexisted harmoniously"
with federal intellectual property law. (*Bonito Boats, Inc. v.
Thunder Craft Boats, Inc.* (1989) 489 U.S. 141, 165–166 [noting
the coexistence of patent law with state unfair competition laws
similar to the Lanham Act].)

Serova is plainly not asserting ownership in copyrightable
material associated with *Michael*. She sues as a consumer, not
a purported rights holder claiming infringement. More than
that, Serova's claims do not depend on who owns such rights. In
fact, as Sony itself noted in its answering brief, there appears to
be no dispute in this lawsuit that those rights belong to MJJ
Productions, Inc., regardless of who provided lead vocals for the
Cascio tracks. Finally, Serova is not seeking to enjoin
reproduction or distribution of the sound recordings on *Michael*,
but rather contests the album's marketing claims. (See

*Sybersound Records, Inc. v. UAV Corp.* (9th Cir. 2008) 517 F.3d 1137, 1152 [a UCL claim insofar as it was "based on copyright infringement" was preempted, but a UCL claim based on "alleged misrepresentations" remained].) Federal copyright law, then, and Serova's consumer deception claims — at least as they have taken shape here on Sony's anti-SLAPP motion — can coexist harmoniously.

## IV. CONCLUSION

Serova has sufficiently demonstrated, for purposes of the anti-SLAPP proceedings before us, that her CLRA and UCL claims related to *Michael*'s packaging and promotional video have sufficient merit. Perhaps in another context the First Amendment would limit the reach of our consumer protection laws, but Sony's album-back promise and video are commercial advertising making claims about a product, and we will not place them beyond the reach of state regulation. We therefore reverse the judgment of the Court of Appeal insofar as it ordered struck, per the anti-SLAPP statute, those claims of Serova against Sony that remained after the trial court's order, and we remand for further proceedings consistent with this opinion, including any dismissal proceedings contemplated by the parties' settlement agreement.

**JENKINS, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Serova v. Sony Music Entertainment

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 44 Cal.App.5th 103
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S260736
**Date Filed:** August 18, 2022

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Ann I. Jones

_____

**Counsel:**

Katten Muchin Rosenman, Zia F. Modabber, Andrew J. Demko, Tami Kameda Sims, Shelby A. Palmer, Charlotte S. Wasserstein, Leah E.A. Solomon; Kinsella Weitzman Iser Kump & Aldisert, Kinsella Weitzman Iser Kump, Jonathan P. Steinsapir, Howard Weitzman and Suann C. Macisaac for Defendants and Appellants.

Davis Wright Tremaine, Thomas R. Burke, Rochelle L. Wilcox and Dan Laidman for First Amendment Coalition as Amicus Curiae on behalf of Defendants and Appellants.

Moss Bollinger, Jeremy F. Bollinger, Ari E. Moss and Dennis F. Moss for Plaintiff and Respondent.

Seth E. Mermin and Eliza J. Duggan for UC Berkeley Center for Consumer Law and Economic Justice, Truth in Advertising, Inc., Public Counsel, Legal Aid Society of San Diego, Housing & Economic Rights Advocates, East Bay Community Law Center, Consumers for

Auto Reliability and Safety, Consumer Action and Bay Area Legal Aid as Amici Curiae on behalf of Plaintiff and Respondent.

Arbogast Law, David M. Arbogast; and Micha Star Liberty for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Janill L. Richards, Principal Deputy State Solicitor General, Samuel T. Harbourt and Amari L. Hammonds, Deputy State Solicitors General, for the Attorney General as Amicus Curiae on behalf of Plaintiff and Respondent.

Michael N. Feuer, City Attorney (Los Angeles), Wilfredo R. Rivera, Deputy Chief City Attorney, Christina V. Tusan, William R. Pletcher and Miguel J. Ruiz, Deputy City Attorneys, for the Los Angeles City Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Zia F. Modabber
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90067
(310) 788-4627

Dennis F. Moss
Moss Bollinger LLP
15300 Ventura Boulevard, Suite 207
Sherman Oaks, CA 91403
(310) 985-0555

Samuel T. Harbourt
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3919